# EXHIBIT  1

1  Maxwell V. Pritt (SBN 253155)
     mpritt@bsfllp.com
2  Joshua I. Schiller (SBN 330653)
     jischiller@bsfllp.com
3  Beko O. Reblitz-Richardson (SBN 238027)
     brichardson@bsfllp.com
4  BOIES SCHILLER FLEXNER LLP
   44 Montgomery Street, 41st Floor
5  San Francisco, CA 94104
   Telephone:     (415) 293-6800
6  Facsimile:     (415) 293-6899

7  *Counsel for Plaintiffs Applied
   Underwriters, Inc.*
8  *and Applied Risk Services, Inc.*

9

                    **UNITED STATES DISTRICT COURT**

10

                    **EASTERN DISTRICT OF CALIFORNIA**

11

12  APPLIED UNDERWRITERS, INC., a          NO. 2:20-cv-02096-WBS-AC
    Nebraska corporation; and APPLIED
13  RISK SERVICES, INC., a Nebraska        **FIRST AMENDED COMPLAINT FOR**
    Corporation,                           **DECLARATORY AND INJUNCTIVE**
14                                         **RELIEF FOR:**

15              Plaintiffs,                **(1) VIOLATION OF THE DUE**
                                               **PROCESS CLAUSE;**
16         v.                              **(2) VIOLATION OF THE EQUAL**
                                               **PROTECTION CLAUSE;**
17                                         **(3) VIOLATION OF THE DORMANT**
    INSURANCE COMMISSIONER OF THE              **COMMERCE CLAUSE;**
18  STATE OF CALIFORNIA RICARDO LARA,      **(4) UNLAWFUL TAKING; AND**
    in his official capacity;              **(5) VIOLATION OF THE FIRST**
19  CALIFORNIA DEPARTMENT OF INSURANCE         **AMENDMENT**
    DEPUTY COMMISSIONER KENNETH
20  SCHNOLL, in his official capacity;
    CALIFORNIA DEPARTMENT OF INSURANCE     **DEMAND FOR JURY TRIAL**
21  DEPUTY COMMISSIONER BRYANT HENLEY,
    in his official capacity; and DOES
22  1-20.

23              Defendants.

24

25

26

27

28

1     Plaintiffs Applied Underwriters, Inc. ("Applied") and Applied

2   Risk Services, Inc. ("ARS," and together with Applied,

3   "Plaintiffs"), by and through their attorneys, hereby allege, upon

4   personal knowledge of their own acts and status, and upon

5   information and belief as to all other matters set forth herein, as

6   follows:

7                              **INTRODUCTION**

8     1.   This case involves California insurance officials'

9   unconstitutional and bad faith abuse of their positions and powers

10  to (i) take and redistribute Plaintiffs' contractual and other

11  property rights, (ii) discriminate against out-of-state commerce,

12  (iii) deprive Plaintiffs of their rights to due process of law and

13  to equal protection of the laws, and (iv) retaliate against

14  Plaintiffs for exercising their First Amendment right to pursue

15  their rights in court and to speak out about Defendants' illegal

16  conduct.

17    2.   Applied and its affiliates primarily write workers'

18  compensation insurance through multiple insurance companies in all

19  50 states, and have done so since 2002. Formed in 2004, California

20  Insurance Company ("CIC") is the largest of those companies. Since

21  2004, CIC has grown into a company with over a billion dollars in

22  assets and over $600 million in capital and surplus. In addition

23  to their business activities unrelated to CIC, Plaintiffs perform

24  certain functions for CIC. Plaintiffs profit from contractual fees

25  and commissions that increase when CIC attracts and maintains

26  customers.

27    3.   Defendants have significant powers under state law to

28  seek and maintain a conservatorship and impose appropriate remedies

---

1    when an insurance company faces financial insolvency, commits
2    certain violations of law, or takes other actions that pose a
3    significant risk to policyholders.  But those powers may not be
4    used to deprive regulated parties of constitutional rights rather
5    than to address legitimate regulatory concerns, as Defendants have
6    done here.

7         4.   Defendants have unlawfully and in bad faith abused their
8    state powers, and in doing so violated Plaintiffs' constitutional
9    rights.  Defendants sought and obtained a conservation over CIC
10   despite having no concern about its financial condition.  Indeed,
11   Defendants have acknowledged repeatedly that CIC's financial status
12   "has remained stable" and its "credit rating remains at its pre-
13   conservation A (Excellent) level."  Nor did Defendants identify any
14   risk to policyholders when CIC sought to merge with a New Mexico
15   entity ("CIC II").  Rather, Defendants agreed that "because of CIC's
16   considerable capital, surplus, and deposits, the proposed merger
17   presents **no risks** to California policyholders."  Defendants used
18   CIC's merger with CIC II as an opportunity to wield their broad
19   state powers to harm CIC and Plaintiffs, including through the
20   unlawful transfer of valuable contractual, property, and litigation
21   rights to policyholders, and by stripping CIC of its California
22   assets.

23        5.   Defendants were motivated by their enmity and opposition
24   to Plaintiffs' successes in prior and ongoing private litigation
25   related to the EquityComp® insurance program, which contains a
26   profit-sharing structure that accounted for profit and risk through
27   accounts held by Applied Underwriters Captive Risk Assurance
28   Company ("AUCRA"), a captive risk facility affiliated with CIC and

1    Applied.

2         6.    The California Department of Insurance ("CDI") previously

3    challenged EquityComp® in an administrative proceeding against CIC

4    and AUCRA, resulting in a settlement agreement in 2017 (the "2017

5    Settlement Agreement").    Labeling the disagreement over the

6    enforceability of EquityComp® a "good faith dispute" in the 2017

7    Settlement Agreement, CDI agreed AUCRA and CIC would modify the

8    EquityComp® program but leave existing policies intact such that

9    any issues would be addressed in private lawsuits.    This meant CDI

10   ultimately left the legality of EquityComp® to the courts, including

11   this Court.

12        7.    Plaintiffs have succeeded in subsequent private

13   litigation over the enforceability of the EquityComp® program.    For

14   example, in 2019, this Court rejected class treatment for

15   policyholders and further rejected Defendants' claim that the

16   profit-sharing provision in EquityComp® was unlawful.    *See Shasta*

17   *Linen Supply, Inc. v. Applied Underwriters, Inc.*, Nos. 2:16-cv-158

18   WBS AC, 2:16-cv-1211 WBS AC, 2019 WL 358517 (E.D. Cal. Jan. 29,

19   2019); *Pet Food Express, Ltd. v. Applied Underwriters, Inc.*, No.

20   2:16-CV-01211 WBS AC, 2019 WL 4318584 (E.D. Cal. Sept. 12, 2019).

21   And in November 2019, the Honorable Henry Walsh of the Superior

22   Court of California, County of Ventura issued a written decision

23   after a full trial on the merits that affirmed the enforceability

24   of CIC's policies against a challenge by one of its insureds who

25   claimed the policies "flouted" the regulatory process.    *Roadrunner*

26   *Management, et al. v. Applied Underwriters*, et al., No. 56-2017-

27   00493931-CU-CO-VTA (Nov. 12, 2019).    In that action, the state court

28   also issued a statement of intended decision awarding $340,419 to

1   CIC on Defendants' cross claims. Two California Insurance
2   Commissioners, including Defendant Commissioner Lara, also have
3   ruled in favor of Plaintiffs' position in nine administrative
4   proceedings.

5       8.   Defendants disapproved of Plaintiffs' success in these
6   cases and seized on an opportunity to coerce settlement of them and
7   harm Plaintiffs in other ways when Steven Menzies, who at the time
8   was a CIC minority shareholder, requested the CDI's approval to
9   acquire CIC. Without any threat of harm to policyholders in
10  California or elsewhere, Defendants set out to harm CIC and
11  Plaintiffs.

12      9.   First, in bad faith and to harm Plaintiffs, Defendants
13  declined to approve or disapprove the acquisition by the agreed-to
14  closing date of which CDI was well aware. Additionally, Defendants
15  delayed notifying CIC and Menzies of their decision to do nothing
16  until the very last business day before the closing deadline when
17  they knew Menzies would face a $50 million penalty if the deal did
18  not close.

19      10.  Second, Defendants imposed a conservatorship over CIC to
20  force it and Plaintiffs to settle private litigation on
21  disadvantageous terms that would transfer Plaintiffs' property and
22  contract rights to policyholders and force Plaintiffs to adopt the
23  very legal position that this Court and others have already
24  rejected. Defendants sought and obtained the conservatorship on
25  the pretextual basis that CIC had not secured written approval of
26  the CIC-CIC II merger, even after New Mexico regulators authorized
27  the merger in part by relying on Defendants' statements that the
28  merger posed no risk to policyholders, and on Defendants' failure

1    to object to the merger when they were given the opportunity to do

2    so.

3         11.   Defendants' abuses of powers have violated and continue

4    to violate several of Plaintiffs' constitutional rights.

5    Defendants have never contended, much less shown, that CIC's

6    redomestication to New Mexico and merger with CIC II threatened to

7    harm CIC's California policyholders generally or any policyholder

8    litigants by, for example, threatening the ability to pay

9    unsuccessful judgments.   Indeed, Defendants were well aware that

10   the merged New Mexico entity, CIC II, is a successor to all CIC

11   liabilities as a matter of law, that New Mexico ensured CIC II would

12   maintain the same deposit with the CDI as CIC maintained, and that

13   the merged entity will be adequately capitalized to handle any

14   judgments for any prevailing policyholders.   Defendants instead are

15   using their broad state conservation powers as a club to force

16   settlement by parties in private litigation that they want

17   policyholders and their attorneys to win, and to otherwise harm CIC

18   and Plaintiffs.

19        12.   Defendants' bad-faith and unconstitutional agenda is

20   clear.   First, Defendants admitted to the New Mexico Superintendent

21   of Insurance that the redomestication and merger posed no harm to

22   policyholders.   Second, their e-mail sent the last business day

23   before the closing of the sale of CIC stated they could not approve

24   or disapprove the sale, and the only reason referenced was the

25   private litigation.   Third, they stated in an affidavit that it was

26   "meaningless" to stop CIC's merger with the New Mexico entity

27   because doing so would not address the ongoing litigation involving

28   EquityComp®.

13.  Most starkly, Defendants now seek to impose a nonconsensual "rehabilitation" plan on CIC and Plaintiffs—Nebraska corporations that are not parties to the state conservation proceedings—which requires settlement of over 40 private EquityComp® lawsuits on specified terms designed to favor policyholders and their attorneys, and to harm Plaintiffs. Defendants' plan also forces the settlement of claims not yet filed. It thus seeks the type of class treatment this Court rejected in *Shasta*.

14.  Moreover, Defendants' rehabilitation plan would require *Plaintiffs* to settle private claims, including claims that do not even involve CIC and disputes in which Plaintiffs are owed money, even though Plaintiffs are not parties to the conservation proceeding.

15.  Defendants' rehabilitation plan takes, and redistributes to private parties, the property and contract rights of other private parties, including Plaintiffs.  It also imposes an unconstitutional condition on the lifting of the conservatorship over CIC, and deprives Plaintiffs of liberty and property without due process.  Indeed, the rehabilitation plan expressly purports to apply to any insurance policy that includes a single California employee, even if the employer is otherwise out of state in every other respect.

16.  As an additional reflection of just how far Defendants' rehabilitation plan veers from constitutional purposes, state law authorizes conservators to settle litigation "upon such terms and conditions as the commissioner shall deem most advantageous *to the estate of the person being administered* . . . . "  But in an

affidavit submitted with their plan, Defendants did not even attempt to claim this standard is met. Instead, the affidavit makes no secret that Defendants seek to invite and force settlement of claims over EquityComp® in favor of policyholders and at the expense of CIC and Plaintiffs.

17. Defendants' rehabilitation plan also forces CIC to transfer all of its California business to an unrelated entity, undermining Plaintiffs' ability to serve those policies. This provision is gratuitous, punitive, and unconstitutional. Nothing about CIC's merger divests CIC of its California business. Out-of-state insurance companies do business in California as a matter of course, and Defendants themselves represented to the New Mexico Superintendent of Insurance that the merger and redomestication of CIC to New Mexico will not harm CIC's California policyholders. This part of Defendants' rehabilitation plan would wrongfully deprive Plaintiffs of a projected $100 million or more in profit that would otherwise flow directly from the work they perform for CIC.

18. Such discrimination against out-of-state commerce violates the Dormant Commerce Clause, and in this case has harmed and continues to harm Plaintiffs, who are Nebraska corporations. Moreover, Defendants seek with their rehabilitation plan to take property and contracts and redistribute them to other private entities, deprive Plaintiffs of property rights without due process, and single out Plaintiffs for punitive treatment in retaliation for exercising First Amendment rights and in violation of equal protection.

19. Defendants' constitutional violations are clear on their

FIRST AMENDED COMPLAINT
CASE NO. 2:20-CV-02096-WBS-AC

1  face, and there is ample evidence of the additional bad-faith,

2  extortionate, and punitive nature of the conservatorship they

3  solicited and have maintained, and which continues to harm

4  Plaintiffs.  This evidence is thoroughly detailed *infra*, but

5  includes:

6      a. Defendants' failure to approve the sale of CIC after

7         five months even though Defendants admitted that the

8         sale and merger of CIC posed no harm to

9         policyholders;

10     b. Multiple states' approval of the sale of CIC, and

11        Defendants' failure to identify any basis for

12        denying it;

13     c. Defendants' failure to notify CIC's buyer that there

14        would be any issue in meeting a closing deadline

15        (costing the buyer $50 million if not met) until the

16        last business day before the closing deadline, which

17        necessitated CIC's redomestication by merger in New

18        Mexico;

19     d. Defendants' lack of any objection to CIC's

20        redomestication to New Mexico through acquisition by

21        merger;

22     e. Defendants' admissions that CIC was financially

23        sound and the merger posed no risk to its

24        policyholders;

25     f. The lack of any basis for seeking to stop CIC's

26        merger with CIC II, much less to maintain an ongoing

27        conservatorship over CIC on the basis of that

28        merger;

g. The lack of any notice to CIC before imposing a conservatorship over CIC under a lax standard of review in California state court, even as CIC had pursued both the sale and the merger with CIC II in good faith and with full disclosure to and participation by CDI;

h. Defendants' misrepresentations and omissions to the California state courts in order to secure *ex parte* and to continue to maintain the conservatorship over CIC;

i. The relief sought in Defendants' nonconsensual rehabilitation plan in California state court, its lack of relationship to the CIC-CIC II merger as the ostensible basis for the conservatorship over CIC, and Defendants' longstanding efforts to force that relief;

j. Defendants' efforts to force Nebraska corporations that are not in conservation and are not parties to the conservation proceedings to settle private claims; and

k. The fact that Defendants have designed their nonconsensual rehabilitation plan, on its face, to provide relief to select policyholders and their attorneys rather than secure the best value for CIC.

20. Defendants' unconstitutional actions have caused, continue to cause, and threaten to cause further substantial and irreparable harm to Plaintiffs requiring injunctive relief. This includes:

a. Controlling Plaintiffs' business and ongoing litigation:

   i. Obtaining stays of private litigation, including a case where the court issued a statement of intended decision to award CIC $340,419;

   ii. Blocking Plaintiffs' business transactions, including most recently, a letter dated December 11, 2020, that purports to instruct CIC and Applied not to transfer any existing insurance policies or renew existing policies.

b. Loss of goodwill due to the conservatorship, which, as noted, generally represents serious financial or other legal problems with a company and a risk to policyholders;

c. Lost profits that amount to an estimated $10 million to date and will balloon to over $100 million when the rehabilitation plan is adopted and implemented;

d. Forced settlement of existing and potential claims involving Plaintiffs, and the redistribution of their contractual and property rights to other private parties;

e. The deprivation of Plaintiffs' contractual relationships and goodwill with CIC from the forced transfer of CIC's California business to an unrelated California entity that will eliminate Plaintiffs' ability to service the insurance policies; and

1              f. The forced waiver of claims, including those herein,

2                  against Defendants.

3     21.  Both  prior  to  and  since  Plaintiffs  initiated  this

4  proceeding on October 20, 2020, Defendants have sought refuge in

5  the powers and deference that the Commissioner is typically afforded

6  in  state  conservation  proceedings.   State law, however, cannot

7  shield  constitutional  violations  or  injuries  inflicted  on

8  Plaintiffs as part of a proceeding brought in bad faith or otherwise

9  for  the  purpose  of  inflicting  harm.   Nor  can  Defendants  force

10  Plaintiffs  to  litigate  their  own  constitutional  claims  for  their

11  own  injuries—or  to  settle  more  than  40  cases—in  a  conservation

12  proceeding  to  which  Plaintiffs  are  not  subject.   Plaintiffs  thus

13  seek  equitable  and  declaratory  relief  tailored  to  the  range  of

14  ongoing  irreparable  harms  that  the  Defendants  are  inflicting  on

15  Plaintiffs  and  the  specific  irreparable  harms  they  threaten  to

16  inflict on Plaintiffs imminently if they are not enjoined from doing

17  so.

18  **THE PARTIES**

19      22.  Applied  is  a  Nebraska  Corporation  with  its  principal

20  place of business in Omaha, Douglas County, Nebraska.  Since October

21  10, 2019, Applied has been owned by Bernard Acquisition Company,

22  LLC.   Neither CIC nor Steven Menzies have any direct or indirect

23  ownership interest in Applied, and Applied has no direct or indirect

24  ownership interest in CIC.

25      23.  ARS is a Nebraska Corporation with its principal place of

26  business in Omaha, Douglas County, Nebraska.  ARS is a wholly owned

27  subsidiary of Applied.   Neither CIC nor Steven Menzies have any

28

1  direct or indirect ownership interest in ARS, and ARS has no direct

2  or indirect ownership interest in CIC.

3      24.  Applied and ARS maintain separate books and records with

4  respect to CIC, AUCRA, and each other.  For regulatory reasons and

5  because their operations are entirely separate, Applied and ARS do

6  not commingle funds with CIC, AUCRA, or each other.  Applied and

7  ARS maintain an entirely separate corporate identity from CIC,

8  AUCRA, and each other.

9      25.  Both Plaintiffs do business in all 50 states.  Both

10  provide payroll, agency, and claim services, among other things,

11  for various insurance companies located around the country,

12  including CIC.

13      26.  Ricardo Lara is the Commissioner of the CDI, and is a

14  citizen of and an elected official in California, who on information

15  and belief currently resides in and/or is domiciled in Sacramento

16  County.

17      27.  Kenneth Schnoll is Deputy Commissioner and General

18  Counsel of CDI.  Schnoll is a citizen of and an elected official in

19  California, who on information and belief currently resides in

20  and/or is domiciled in Sacramento County.

21      28.  Bryant Henley is Deputy Commissioner of CDI.  Henley is

22  a citizen of and an elected official in California, who on

23  information and belief currently resides in and/or is domiciled in

24  Sacramento County.

25      29.  Plaintiffs bring their claims against the Commissioner,

26  Schnoll, and Henley (collectively, "Defendants" or "the

27  Commissioner") in the official capacities of their titles as

28  described above.

1     30.   The true names of Defendants DOES 1-20, inclusive,

2  whether individual, corporate, associate, or otherwise, are unknown

3  to Plaintiffs.   Plaintiffs are informed and believe and thereon

4  allege that each of the DOE Defendants is in some manner affiliated

5  with the Commissioner or CDI.

6                        **RELEVANT NON-PARTIES**

7     31.   Non-party CIC is a California corporation and is

8  regulated by CDI.   CIC is licensed to do business in 26 states,

9  including California.   On October 9, 2019, the New Mexico Office of

10  Superintendent of Insurance approved CIC's merger with non-party

11  CIC II.   Since October 10, 2019, CIC has been wholly owned by Steven

12  Menzies.

13     32.   Non-party California Insurance Company, a New Mexico

14  Corporation (CIC II), is a New Mexico corporation with its principal

15  place of business in Santa Fe, New Mexico.   CIC II is regulated by

16  the New Mexico Office of Superintendent of Insurance, and is

17  licensed to do business in New Mexico.   CIC II is wholly owned by

18  Steven Menzies.

19     33.   Non-party AUCRA is a New Mexico company regulated by the

20  Office of Superintendent of Insurance and was previously an Iowa

21  domiciled company regulated by the Iowa Division of Insurance.

22  AUCRA is wholly owned by Steven Menzies.

23                      **JURISDICTION AND VENUE**

24     34.   This Court has jurisdiction under 28 U.S.C. §§ 1331 and

25  1343, as Plaintiffs' claims arise under the Due Process, Equal

26  Protection, Commerce, and Takings Clauses of the United States

27  Constitution, the First Amendment of the United States

28  Constitution, and the Civil Rights Act, 42 U.S.C. § 1983.

---

35. This Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

36. This Court additionally has jurisdiction and discretion to award attorneys' fees under 42 U.S.C. § 1988(b).

37. Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(2). Defendants are considered to reside in this District because it is where they perform their official duties.

## FACTUAL BACKGROUND

**A.   The EquityComp® Program and Settlement with the Commissioner, and This Court's Decision Upholding the Program.**

38. Applied's group of insurance companies, which until October 2019 included CIC, has been consistently rated A or A+ by A.M. Best. The group writes workers' compensation insurance in all 50 states in the United States, and has been acknowledged as a leader in the workers' compensation marketplace.

39. Before 2016, Applied's affiliates offered a workers' compensation program to California employers called EquityComp®.

40. EquityComp® was a loss sensitive workers' compensation insurance program that both provided participant employers with workers' compensation insurance coverage required under California law and gave employers the opportunity to share in underwriting profits if their claims loss experience was favorable. The profit sharing component was offered through a separate reinsurance agreement, the RPA, with a separate company, AUCRA.

1    41.  EquityComp® was granted a Patent by the U.S. Patent Office

2  in 2011 (No. US 7,908,157 B1).

3    42.  The CDI examined EquityComp® through no less than five

4  financial and market conduct examinations over the course of a

5  decade, and was fully aware of its existence, structure, and how it

6  operated, including its "risk sharing features" and "accompanying

7  Profit Sharing Plan." *See Shasta Linen Supply, Inc. v. Applied*

8  *Underwriters, Inc.*, 2017 WL 4652758, at *5 (E.D. Cal. Oct. 17,

9  2017).  CDI was well aware of EquityComp®'s structure and that

10  AUCRA had separate profit-sharing agreements with employers that

11  AUCRA did not file with the CDI.

12    43.  Nonetheless, on June 20, 2016, the Commissioner issued a

13  Decision and Order holding that the RPA was an unfiled collateral

14  agreement in violation of California Insurance Code § 11658 (among

15  other Insurance Code provisions).  The Commissioner then issued a

16  Notice of Hearing and Order to Cease and Desist on June 28, 2016,

17  seeking an order requiring CIC and AUCRA to cease and desist from

18  issuing policies incorporating the RPA.  CIC filed a Verified

19  Petition for Peremptory Writ of Mandate (the "Writ Proceeding")

20  challenging the June 20 Order.

21    44.  While the Writ Proceeding was pending, the parties

22  executed a Stipulated Consent Cease and Desist Order on September

23  6, 2016, in which the parties agreed, among other things, that AUCRA

24  could continue to enforce existing RPAs subject to small changes to

25  the arbitral forum and run-off loss adjustment factor provisions.

26  On June 2, 2017, CDI, CIC, and AUCRA entered into the 2017

27  Settlement Agreement in which the parties agreed to dismiss the

28  Writ Proceeding and that an Amended RPA, substantively identical to

1  the original RPA, would be filed to allow new RPAs to issue under

2  EquityComp®.  The Agreement stated, "The CDI currently contemplates

3  no additional action as to CIC or AUCRA related to the EquityComp®

4  program."

5      45.  The 2017 Settlement Agreement left disputes over the

6  prior RPA to private litigants and the courts.  (The CDI still

7  allowed complaints to be filed in its Administrative Hearing Bureau,

8  in which CDI purported to invalidate RFPs, but these rulings were

9  subject to review by writ in the courts.)  In the years that

10 followed, certain California employers who entered into EquityComp®

11 brought lawsuits against Applied, CIC, AUCRA, and ARS seeking an

12 order that the prior RPA was void.

13     46.  That litigation included lawsuits brought in this Court

14 that resulted in the Court denying class certification to California

15 employers that entered into EquityComp®. *Shasta Linen Supply*, 2019

16 WL 358517, *7 (finding that "a class action is not superior to other

17 available methods for fairly and efficiently adjudicating the

18 controversy").  This Court also held that the prior RPAs were not

19 void as a matter of law.  *Pet Food Express*, 2019 WL 4318584.  And

20 the Court's order was not appealed.

21     47.  Applied and its affiliates have defeated class actions

22 relating to EquityComp® in California, New York, and Nebraska, and,

23 out of scores of lawsuits, no adverse judgment has been entered

24 against Applied or CIC.

25 ///

26 ///

27 ///

28 ///

**B.  Defendants Fail to Approve or Disapprove the Sale of CIC on the Business Day Before the Closing Deadline Without Prior Notice and Despite Having Had Five Months to Consider the Application.**

48.  In January 2019, Menzies, who was an indirect owner of 11.5% of CIC's shares, entered into an agreement with Berkshire Hathaway Inc. ("Berkshire")—which at that time owned 81% of the holding company that indirectly owned CIC—to purchase Berkshire's interest in CIC (the "Berkshire/Menzies Agreement").

49.  A related part of the above transaction involved the sale of Applied to a third-party.  Applied's business was, to a large extent, servicing CIC policies (collecting the premium, etc.) and providing payroll services.  Following the transaction, Applied was no longer affiliated with CIC, but its income stream and value (along with the income stream and value of ARS) continued to depend on providing policy and payroll services to CIC policyholders.

50.  The Berkshire/Menzies Agreement included a $50 million "breakup fee" if the transaction could not be completed by September 30, 2019.  Applied, Menzies, and CIC immediately set about informing Defendants of the proposed sale, including the closing date and $50 million penalty, and filing all the necessary paperwork to obtain the CDI's approval in time to ensure timely completion of the deal.

51.  To allow ample time for approval, Menzies, as the ultimate controlling person proposed to acquire control of CIC, submitted a third "Form A" on April 9, 2019, more than five months before the sale closing deadline of September 30, 2019 ("First Form A").

52.  A "Form A" submission to insurance regulators is used when a person proposes to acquire control of an insurer by offering to acquire voting securities.  The First Form A explained that

1  Menzies, who was the President and Chief Executive Officer of CIC,

2  was offering to acquire control of CIC through transactions with

3  Berkshire, the indirect parent of CIC.

4      53.  The First Form A explained that the Berkshire/Menzies

5  Agreement was valued at over $700 million and was structured by

6  Berkshire to require closing with all regulatory approvals on or

7  before September 30, 2019, or Menzies would forfeit a $50 million

8  non-refundable deposit ("break-up fee").  The First Form A therefore

9  put the Commissioner on notice that time was of the essence and

10  approval was necessary not later than September 30.

11      54.  After an initial review of the First Form A, the CDI

12  requested that Menzies provide supplemental information.  Menzies

13  promptly agreed to do so.  Menzies agreed to withdraw the First

14  Form A and refile.

15      55.  Menzies submitted a second Form A on June 12, 2019 to

16  address the requested information ("Second Form A").

17      56.  CDI then requested additional information—including

18  information the CDI previously found unnecessary—and Menzies agreed

19  to submit another Form A.

20      57.  Menzies submitted a third Form A on September 7, 2019

21  ("Third Form A").

22      58.  CDI then sought limited additional information, in

23  communications dated September 13, 19, and 24, 2019.

24      59.  Menzies provided the requested documents and

25  clarification.  Each response included a request to meet and confer

26  with CDI on any other outstanding matters to ensure that the

27  September 30, 2019 closing deadline would be met.

28

1      60.   CDI never at any point in this process suggested it would

2  be  unable  to  complete  the  Form  A  review  prior  to  Berkshire's

3  September 30, 2019 closing deadline.

4      61.   On September 24, Laszlo Komjathy, Jr. ("Komjathy"), a CDI

5  attorney, requested copies of corporate resolutions as what appeared

6  to be the final paperwork necessary for approval.  CIC provided

7  those resolutions to the CDI on September 25.  Komjathy did not

8  indicate any requests were outstanding.  Accordingly, Menzies and

9  CIC initiated preparations for the September 30, 2019 closing.

10  Applied and CIC also obtained approval from the CDI's counterparts

11  in Iowa, Texas, and Hawaii, which were necessary to close the

12  transaction.

13      62.   Without prior notice or indication, on the afternoon of

14  Friday, September 27, 2019, the final business day before the

15  September 30, 2019 Berkshire deadline, Komjathy e-mailed CIC,

16  stating CDI would "neither approve nor disapprove the pending

17  application prior to September 30, 2019," which put Menzies at

18  imminent risk of forfeiting the $50 million deposit.  In his cover

19  e-mail, Komjathy indicated he was "out of the office" on Friday,

20  September 27, directed CIC to contact Bryant Henley with any

21  questions, and made no mention of the financial risk to Menzies

22  Defendants created with their dilatory review process.

23      63.   Multiple attempts to reach Henley and CDI's General

24  Counsel, Kenneth Schnoll, were made immediately after receiving the

25  September 27 email.  Those calls were not returned.  Thus, on the

26  last business day before Berkshire's September 30 transaction

27  deadline—a deadline the CDI knew would result in the forfeiture of

28  $50 million—CDI notified Menzies that its point regulator was "out

of the office," and the person appointed to take his place refused to return any calls.

**C.   Defendants Offer No Objection to CIC's Proposal to Redomesticate to New Mexico by Merger, and the New Mexico Superintendent of Insurance and Two Other States Approve the Merger.**

64.  Facing a $50 million penalty for delaying the Agreement's consummation, Applied, Menzies, and CIC negotiated a 10-day extension of the closing.  The extension alone cost $10 million, in addition to the previously approved purchase price.

65.  Over the following days, numerous additional calls to multiple CDI officials went unanswered.  Accordingly, Menzies contacted the New Mexico Superintendent of Insurance, John G. Franchini ("Superintendent Franchini" or "Superintendent"), to determine if the transaction could instead be approved under the supervision of New Mexico's Insurance Department.

66.  Superintendent Franchini proposed to redomesticate CIC to New Mexico under an expedited approval process, permitting the sale approval and closing before the extended deadline.  With no practicable alternative, Applied, CIC, and Menzies worked with the Superintendent to finalize the sale and obtain all necessary approvals, including the formation of a new entity in New Mexico, CIC II, which would ultimately merge with CIC.

67.  Superintendent Franchini informed Defendants of this process, communicating with the Commissioner and other pertinent insurance departments to obtain approvals.  The communications culminated in a conference call and Form A approval hearing (required by statute) on October 9, 2019, of which Defendants were

1    provided advance notice.   Insurance regulators from New Mexico,

2    Texas, and California (with representatives of the CDI)

3    participated in the October 9 conference call and attended the Form

4    A approval hearing which followed.   At least three CDI senior

5    officials represented Defendants at the October 9 hearing

6    (including Komjathy).   The CDI officials were *specifically asked*

7    *whether they objected to the merger or the sale's consummation*, yet

8    none objected during the pre-hearing conference call or in the

9    course of the hearing itself, during which the Superintendent

10   approved the merger.   Rather, CDI attorneys told the Superintendent

11   that "because of CIC's considerable capital, surplus and deposits,

12   ***the proposed merger presented no risks to California***

13   ***policyholders***."

14        68.   The hearing officer recommended the approval of CIC's

15   Form A, and Superintendent Franchini issued an Order specifically

16   noting CDI participated in the hearing and did not object.   A copy

17   of the Order was sent to the Commissioner by e-mail the same day.

18   Again the Commissioner did not object.

19        69.   Following Superintendent Franchini's Order, Berkshire

20   sent the Chief Staff Counsel for the New Mexico Department of

21   Insurance and the Commissioner, through Komjathy, an e-mail

22   advising that, based on the lack of objection at the Form A approval

23   hearing, Berkshire planned to proceed with the closing scheduled

24   for the next day, October 10, 2019.   Once again, Defendants did not

25   object.

26        70.   The Commissioner, through CDI's attorney representatives,

27   also attended an earlier Form A telephonic hearing hosted by Iowa

28

1   state regulators on September 17, 2019, during which the Iowa

2   regulators likewise approved the Berkshire/Menzies Agreement.

3      71.   Superintendent Franchini's Order of Approval stated,

4   among other things, that CIC II must

5              assume and be liable for any and all
              liabilities of California Insurance Company
6              including, but not limited to any issued
              policies as if such policies were issued
7              directly by California Insurance Company, [ ]
              and . . . maintain the current deposit of
8              California Insurance Company with the
              California Department of Insurance for the
9              benefit of its policyholders.

10

11

12      72.   The "current deposit of California Insurance Company with

13   the California Department of Insurance" was, at the time, $248

14   million.   This amount constituted over 100% of the required amount

15   under CDI's regulations given the measure of CIC's issued policy

16   risks in California.

17      73.   As part of the merger, CIC's California-issued

18   Certificate of Insurance—that is, its license to sell and service

19   insurance in the state—could have transferred to CIC II.   Cal. Ins.

20   Code § 709.5.   And because CDI asserts jurisdiction regulating the

21   sale and servicing of insurance policies in California by any

22   company operating with a California Certificate of Insurance,

23   redomestication of CIC via its merger with CIC II should have caused

24   no concern.   That result is fully consistent with and supported by

25   CDI's stated determination that the merger "presented no risks to

26   California policyholders."

27   ///

28   ///

**D.    After the Merger's Approval, Defendants Put CIC Into
       Conservation Without Prior Warning and Based on False
       Pretenses.**

74.  On the evening of October 9, 2019, while CIC executives were en route to New York to close the following day, Defendants, through Komjathy, sent CIC an e-mail alleging Menzies and CIC had abandoned the Third Form A due to the anticipated merger.  The e-mail gave Menzies 10 business days from October 9, 2019 to voluntarily withdraw the Third Form A.  The CDI, however, did not object to the merger that New Mexico's Superintendent Franchini had already approved.

75.  Nine days after New Mexico's approval of the merger, Komjathy asserted for the first time in an October 18, 2019 letter that due to the merger of CIC into CIC II, CIC's certificate of authority "will be extinguished by operation of law and the surviving entity will not be qualified to transact insurance in California."  This assertion came without any warning.  There was no prior notice that the CDI intended to take this position, and there was no legal basis for it.

76.  On October 21, 2019, Applied's General Counsel Jeffrey Silver issued this statement in an Applied press release criticizing CDI's conduct with respect to the Form A submissions:

> We respect that the California Department of
> Insurance had a right to decide on our
> application, and we wish they had done so, one
> way or the other.  Five other state and federal
> regulators did, and by the way all of them
> approved the deal, but after six months
> California still could not complete its
> homework.

1    77.  Superintendent Franchini issued a statement disagreeing

2    with public statements by the Commissioner that the merger had not

3    been fully effected.  In a press release dated October 24, 2019,

4    Superintendent Franchini stated among other things that CIC II was

5    "well positioned to continue [CIC's] insurance operations, maintain

6    its staff, and protect its policyholders and claimants."

7    78.  Following the October 18 letter, CIC and Defendants then

8    entered into discussions to resolve Defendants' belated and

9    unfounded concerns about the merger.  During those talks, Defendants

10   never informed CIC they were contemplating *ex parte* court

11   intervention.

12   79.  Around October 23, 2019, Schnoll and Komjathy telephoned

13   CIC's General Counsel.  During that conversation, Schnoll

14   specifically requested that CIC and CIC II refrain from taking any

15   steps to complete their merger, since CDI wanted to meet and resolve

16   the Form A and merger issues.  Relying on that request, CIC

17   voluntarily refrained from taking any further action relating to

18   the merger, even though Superintendent Franchini had already

19   approved the merger.

20   80.  Immediately following his telephone call with Schnoll and

21   Komjathy, CIC's General Counsel contacted outside counsel and asked

22   him to arrange for a meeting with Schnoll.  Outside counsel made

23   numerous attempts to contact Schnoll after the October 23, 2019

24   call.  Schnoll did not respond and offered no justification for

25   that failure.  Moreover, given the admitted lack of harm from the

26   transaction, which closed almost two weeks previously, any issues

27   the Commissioner identified could have been easily resolved.

28

1    81.  Instead, on November 4, 2019, without any notice to CIC

2  and without justification given the timeline of events and Menzies'

3  and CIC's consistent cooperation, the Commissioner filed an *ex parte*

4  application in the Superior Court of California, County of San Mateo

5  ("San Mateo County Superior" or the "California state court")

6  requesting the extraordinary remedy of placing CIC in conservation

7  under the Commissioner's authority (the "Application").

8    82.  Defendants obtained approval of the conservatorship on

9  false pretenses.  Specifically, Defendants claimed there was

10  urgency because CIC II, as a New Mexico corporation, purportedly

11  lacked authority to transact insurance business in California and,

12  therefore, "if CIC is permitted to consummate the illegal merger,

13  CIC policyholders in California will be left holding policies of a

14  non-admitted insurer."  Defendants, however, had already

15  represented to the New Mexico Superintendent of Insurance that the

16  merger would **not** harm policyholders and did not object to the merger

17  before, during, or after the New Mexico Form A hearing, even when

18  provided with clear opportunities to do so.  Defendants did not

19  inform the California state court of these facts.

20    83.  Likewise, Defendants did not inform the California state

21  court that CIC had already voluntarily agreed to refrain from taking

22  further action on the merger at Defendants' request.  But rather

23  than engage in such good faith discussions, Defendants used the

24  time to apply for the conservation *ex parte* and without notice.

25    84.  CIC informed the California state court that it would

26  agree to an injunction against the merger with the New Mexico

27  entity.  In a subsequent affidavit, Defendants stated that "such an

28  injunction would have been *meaningless*."  Instead, their concern

1 | was that, with Menzies' acquisition of CIC, "the Commissioner's
2 | concerns *with ongoing litigation* were left unaddressed."
3 | Defendants therefore admitted that the purported impact of CIC
4 | merging with a New Mexico corporation was not a legitimate concern.

5 | 85. Defendant's *ex parte* application also contained other
6 | misrepresentations. It falsely portrayed the Form A application as
7 | containing "material deficiencies" when the Commissioner instead
8 | kept asking for more information and admitted the merger would cause
9 | no harm to CIC's policyholders. Further, Defendants have never
10 | identified what information they did not have when, on the eve of
11 | closing, it informed CIC that it would not approve or disapprove
12 | the transaction.

13 | 86. Additionally, the Application misrepresented the history
14 | of EquityComp® as the Commissioner's sole purported example of CIC
15 | engaging in a "pattern of flouting California regulatory processes
16 | designed to protect California policyholders from unfair and
17 | deceptive practices." The Commissioner thereby failed to inform
18 | California state court of the 2017 Settlement Agreement, in which
19 | CDI approved an amended RPA with only minor changes, and the parties
20 | agreed the "good faith dispute" over the legality of the existing
21 | RPA would be left to subsequent private litigation.

22 | 87. Defendants also failed to inform the California state
23 | court about judicial decisions, including from this Court, stating
24 | that the challenged RPA provisions were lawful. In addition to
25 | this Court, other courts have rejected the argument that CIC flouted
26 | the regulatory process in connection with EquityComp®. Most
27 | recently, for example, in November 2019, the Honorable Henry Walsh
28 | of the California Superior Court in the County of Ventura issued a

1   written decision after a full trial on the merits affirming the

2   enforceability of CIC's policies against a challenge by one of its

3   insureds who claimed the policies "flouted" the regulatory process.

4   *Roadrunner Management, et al. v. Applied Underwriters*, et al., No.

5   56-2017-00493931-CU-CO-VTA (Nov. 12, 2019).

6        88.   Additionally, as held by this Court in prior

7   litigation, it *cannot* be inferred that CIC "actively concealed the

8   structure of the insurance program or the existence of the RPA from

9   regulators, plaintiffs, or the public generally." *Shasta Linen

10  Supply*, 2017 WL 4652758, at *5 ("*Shasta Linen*").  This Court further

11  found that CIC had "disclosed in program documents that the RPA is

12  not a filed retrospective rating plan, and detailed how the profit

13  sharing would work," that "it [] appear[ed] that the [CDI] was aware

14  of the RPA's existence," and that CIC described the RPA's operation

15  in its annual Reports of Examination over the course of many years.

16        89.   Indeed, CDI and Defendants have been regularly informed

17  about EquityComp® since its inception.  Starting in 2006, CDI

18  examined EquityComp® and was fully aware of its operation.  CDI did

19  not object to its sale or marketing.  In a report of examination of

20  CIC for the year ending on December 31, 2006 and signed by the

21  Commissioner ("2006 Examination Report"), CDI described the

22  program's structure in detail:

23           The profit sharing plan is similar to an
             incurred loss retro plan.  The profit sharing
24           plan allows the insured to share in the
             benefit of good loss experience at the risk of
25           bearing the cost of unfavorable loss
             experience, within the limits of the plan.
26           Under the profit sharing plan, the profit and
             risk components are accounted for through
27           protected cell accounts in the Company's

28

affiliated captive risk facility, Applied
Underwriters Captive Risk Assurance Company.

90.   CDI reviewed and reported on the EquityComp® program over the next eight years without objection, then entered into the 2017 Settlement Agreement that recognized a "good faith dispute" over the legality of parts of the EquityComp® RPA, not a pattern of "flouting" any law or regulation.

91.   The Commissioner failed to disclose any of this information in the Application.

92.   On November 4, 2019, based upon the Commissioner's misrepresentations and omissions, the *ex parte* nature of the proceeding that ensured a one-sided presentation, and in light of the highly deferential standard of review that applies to those proceedings, the California state court entered the Commissioner's proposed order *ex parte*, imposing a conservatorship over CIC, placing it under Defendants' control pursuant to California Insurance Code § 1011(c) (the "Conservation Order"). That provision permits a conservatorship where an entity, "without first obtaining the consent in writing of the [C]ommissioner, has transferred, or attempted to transfer, substantially its entire property or business or, without consent, has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person."  The Conservation Order, in addition to the financial damage referenced above, has also caused significant harm to the goodwill value of Plaintiffs' businesses.

93.   In a press release issued November 6, 2019, two days after the California state court issued the Conservation Order,

1  Superintendent Franchini stated among other things that (1) CDI had

2  already stated in writing that completion of the merger would result

3  in CIC ceasing to exist, (2) the Conservation Order was ineffective

4  because it was issued against CIC, an entity that had been

5  extinguished in the merger effective October 9, 2019, and (3) the

6  Conservation Order could not supersede his office's authority over

7  CIC II as the surviving entity.

8  **E.   Defendants Renege on Their Commitment To Confirm Publicly**
   **That the Conservatorship Did Not Reflect Financial**
9  **Impairment of CIC, and the Court Denies CIC's Motion to**
   **Vacate Without the Hearing Required By California Law.**
10

11

12  94.   Soon after the Conservation Order was issued, CIC filed

13  an application to vacate it, on November 14, 2019 ("Application to

14  Vacate").   After negotiations between CIC and Defendants,

15  Defendants again acted in bad faith by agreeing (1) that the

16  Commissioner would publicly confirm, among other things, that the

17  conservatorship was based on regulatory issues, not financial

18  impairment, and (2) "to negotiate in good faith to ameliorate the

19  adverse consequences to CIC of the conservation." Such a public

20  statement would have helped restore the goodwill of Plaintiffs.

21  Based upon that agreement and Defendants' representations that it

22  would take no further action harmful to CIC in the conservatorship,

23  CIC withdrew its application to vacate the conservatorship.

24  Plaintiffs understood that Defendants would work with CIC, in good

25  faith, to resolve their dispute and lift the conservatorship as

26  expeditiously as possible.

27  95.   Defendants again failed to live up to their agreement or

28  act in good faith. The Commissioner did not make the public

   statements, as he agreed to, about the nature of the conservatorship

1   and CIC's good financial standing.  Indeed, the Commissioner did

2   nothing to help alleviate harm to Plaintiffs and CIC arising from

3   the conservatorship.

4        96.  On the contrary, Defendants did not even begin to discuss

5   the substance of their purported regulatory issues with CIC for

6   five-and-a-half weeks after the Conservation Order, despite CIC's

7   repeated requests to negotiate.  By the time Defendants finally

8   sent CIC an initial "rehabilitation" proposal on December 13, 2019,

9   Applied and CIC had experienced significant irreparable harm as a

10  result of Defendants' unlawful campaign and acts, including in

11  connection with the Conservation Order obtained through

12  misrepresentations by the Commissioner.

13       97.  Despite Plaintiffs' repeated and good faith attempts to

14  address Defendants' concerns and put an end to the conservation of

15  CIC and the ongoing harms it is causing to CIC and Plaintiffs, CIC

16  was forced to file a motion to vacate the Conservatorship in the

17  California state court on January 21, 2020 ("Motion to Vacate

18  Conservatorship").  CIC originally noticed the Motion to Vacate

19  Conservatorship for February 20, 2020, but CIC acquiesced to the

20  Commissioner's second request for a continuance.  The court then

21  *sua sponte* continued the hearing further in order to rule first on

22  several motions to seal CIC and the Commissioner had filed.  Then,

23  due to COVID-19 court closures, the California state court vacated

24  the hearing date entirely, and it was not re-noticed until August

25  6, 2020.  For over six months CIC remained in conservation limbo

26  with no ability to challenge the conservation, and Applied and ARS

27  remained unable to service new CIC policies.

28

98.    Finally, the California state court heard the Motion to Vacate Conservatorship on August 6, 2020.  The California state court entered an Order denying the Motion to Vacate Conservatorship ("Denial Order") without the full hearing required by California Insurance Code § 1012 and as a matter of due process.  The California state court did not make any of the findings necessary to determine whether the conditions for the Conservation Order continued to exist or had been removed pursuant to California Insurance Code §§ 1012 and 1011(c).

99.    Even before the California state court could hear CIC's Motion to Vacate Conservatorship, and while the parties were still engaged in what were supposed to be good faith negotiations, the Commissioner began filing motions threatening to draw up and release a non-consensual, draconian "rehabilitation" plan.  On July 6, 2020, the Commissioner filed a motion seeking an order setting procedures for court approval of such a plan.  On July 30, the California state court granted the motion and entered the Commissioner's order verbatim (the "Rehabilitation Plan Order").

100.   The Rehabilitation Plan Order allows the Commissioner to issue a broad-sweeping written notice to all CIC policyholders and other third parties and members of the public of the Commissioner's rehabilitation plan, *before* the California state court has even reviewed that plan, let alone approved its provisions, even preliminarily.

///

///

///

**F.    To Lift the Conservatorship, Defendants Seek Not Only To Force CIC To Divest Its California "Book of Business" But To Force CIC and Plaintiffs To Settle More Than 40 Lawsuits.**

101. In proposing rehabilitation plans in this case, Defendants have never sought to address the purported wrong of attempting to effect a merger without approval.  Defendants know they had months to approve the Berkshire/Menzies Agreement and admitted that there would be no harm to policyholders from the CIC-CIC II merger.  And they know Plaintiffs were entirely willing to address their concerns and had agreed to delay completion of the merger during the parties' discussions before Defendants filed the Application.  Defendants cut those discussions short by ceasing to communicate and seeking *ex parte* relief.  Defendants could easily craft a rehabilitation plan to address any alleged concern arising from the CIC-CIC II merger and quickly end the conservatorship, but Defendants never had interest in that type of plan.

102. Instead, on October 19, 2020, the Commissioner filed an application for approval of a non-consensual rehabilitation plan in San Mateo County Superior (the "Rehabilitation Plan" or "Plan").

103. The Commissioner's application consisted of the Rehabilitation Plan, a legal memorandum, declarations from two CDI employees, and the declaration of Larry J. Lichtenegger, a plaintiffs' attorney with a lengthy history of filing lawsuits against CIC and Applied.

104. The Commissioner's application acknowledges that "CIC's financial status has remained stable" and that "CIC's AM Best credit rating remains at its pre-conservation A (Excellent) level." Nonetheless, the Rehabilitation Plan contains draconian terms that would cause Plaintiffs millions of dollars in losses.

1    105. *First*, the Commissioner seeks to require CIC to transfer
2    and reinsure its "book of California business" to "another
3    California-admitted insurer." "CIC's book of California business"
4    consists of valid and binding insurance agreements between CIC and
5    its policyholders that have taken years to accumulate.

6    106. Applied, which works on behalf of CIC and other insurance
7    companies, profits from the operations of CIC in two ways pursuant
8    to the Management Services Agreement ("MSA") executed between them.
9    First, Applied receives administrative fees from CIC clients, which
10   Applied charges as a percentage of each client's payroll. Second,
11   Applied receives commissions from CIC for the premium CIC charges
12   CIC's clients. By forcing the transfer of CIC's California business
13   to another insurer, the Commissioner would cause Plaintiffs to lose,
14   as a conservative estimate, over $100 million dollars in anticipated
15   profit through 2024 alone.

16   107. ARS profits from its Underwriting Agent Agreement ("UAA")
17   with CIC in a similar way by acting on behalf of CIC and otherwise
18   engaging in brokerage activity.

19   108. Each of the MSA and UAA is currently effective through—
20   and cannot be terminated until—September 30, 2021. Each agreement
21   also provides for automatic successive two-year renewals unless
22   nonrenewed by either party with notice provided one year before the
23   end of the then-current term. No party has given notice of
24   nonrenewal of either agreement. The first date by which any party
25   may terminate the MSA or UAA is therefore September 30, 2023. CDI
26   insisted on inclusion of these durational and termination terms in
27   the course of communications concerning Menzies' Form A submissions
28   in 2019.

109. *Second*, the Rehabilitation Plan also seeks to force CIC and Plaintiffs to settle over 40 separate "pending" legal proceedings regarding the EquityComp® program on unreasonable and arbitrary terms dictated by the Commissioner and for which otherwise valid defenses exist.

110. The Rehabilitation Plan governs both CIC and its "affiliates," which the plan defines to include Applied and ARS, even though Applied has not actually been an affiliate of CIC since October 2019. Under the Rehabilitation Plan, every claimant "will be offered an opportunity to make an election to settle any Pending Litigation or Subsequent Litigation." For each such claimant, CIC must pay "or cause to be paid" to the claimant any of three restitution amounts, at the election of the claimant. Moreover, the Rehabilitation Plan prohibits CIC and Plaintiffs from collecting any amounts under the policy above a specified amount. Finally, the Rehabilitation Plan gives claimants the option of prohibiting Plaintiffs from collecting "any charges under the RPA."

111. This part of the Rehabilitation Plan threatens to effect an unconstitutional transfer of contract and other property rights from one set of private litigants (CIC and Plaintiffs) to another set of private litigants (the policyholders). It would deprive CIC and Plaintiffs of their due process rights to litigate their claims. It would require settlement by parties who are not under conservatorship and over whom San Mateo County Superior and the Commissioner lack jurisdiction.

112. While such an order would be unconstitutional under any circumstances, the forced transfer of wealth it entails is still more obvious where various courts have recognized the correctness

of CIC and Plaintiffs' legal positions. *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, Nos. 2:16-cv-158 WBS AC, 2:16-cv-1211 WBS AC, 2019 WL 358517 (E.D. Cal. Jan. 29, 2019); *Pet Food Express, Ltd. v. Applied Underwriters, Inc.*, No. 2:16-CV-01211 WBS AC, 2019 WL 4318584 (E.D. Cal. Sept. 12, 2019); *Roadrunner Management, et al. v. Applied Underwriters*, et al., No. 56-2017-00493931-CU-CO-VTA (Nov. 12, 2019).

113. The Rehabilitation Plan's settlement requirements purport to extend to legal proceedings that involve Plaintiffs but not CIC. And incredibly, they also extend to lawsuits that have not yet been filed. Section VIII of the Plan establishes a "Procedure for Subsequent Litigation" under which CIC must identify all cases CIC or Plaintiffs "ha[ve] asserted, or may believe [they have] a right to assert, the right to bring Subsequent Litigation." For those cases, the claimant must be given the same option to participate as claimants have in existing litigation.

114. To date, at least 40 EquityComp® RPA-related cases have been resolved. As a result of the forced settlements in the Plan, Applied and ARS stand to pay out millions of dollars to settle litigation that remains fully contested and which CDI already agreed ought to be decided through private litigation.

115. In some proceedings implicated by the Rehabilitation Plan, Applied is, in fact, owed money by way of meritorious counterclaim judgments. The terms of the Rehabilitation Plan, then, would force Applied to relinquish its right to those funds and instead pay out "restitution" according to three arbitrary options dictated by the Commissioner.

1    116. This requirement from Defendants ignores the necessarily

2  divergent  facts  and  circumstances  involved  in  each  private

3  litigation.   It  would  reward  frivolous  litigation  by  plaintiff

4  policyholders  and  would  undermine  multiple  court  decisions—

5  including decisions by this Court—that have already found no merit

6  to those plaintiffs' claims, including three failed federal class

7  actions and a number of arbitration and lawsuit wins by Applied and

8  CIC.

9    117. As an illustration, in the *Roadrunner* case identified

10  above, the plaintiff sought to avoid paying both the filed and

11  approved rate charges for its CIC workers' compensation policies

12  and the amounts due under the EquityComp® program, which were

13  included in the CIC policies.   The case went to a bench trial in

14  California state court in October 2019.   On November 12, 2019, the

15  court  issued  a  "Statement  of  Intended  Decision"  denying  the

16  plaintiffs' claims and holding that the defendants *were entitled to*

17  *a  judgment  of  $340,419  on  their  cross-claims*.    No  further

18  proceedings  have  occurred  in  the  *Roadrunner*  case  after  the

19  California  state  court  was  advised  of  the  November  4,  2019

20  Conservation Order.   The Rehabilitation Plan, if applied to the

21  *Roadrunner* judgment, would nullify it.

22    118. Applied also achieved a complete victory in *Shasta Linen*

23  *Supply, Inc. v. Applied Underwriters, Inc.*, a putative class action

24  before the Honorable William B. Shubb of this Court.   As stated

25  above, in reviewing the EquityComp® program, Judge Shubb found no

26  evidence of an attempt to conceal information about the program or

27  its operation from anyone, including state regulators.   The Court

28  subsequently denied the plaintiffs' motion for class certification.

1    One of the named plaintiffs, Pet Food Express, filed a motion for
2    summary judgment, relying on the Commissioner's *Shasta Linen*
3    administrative decision and arguing the profit-sharing agreement
4    under the program was illegal and void, entitling Pet Food to
5    restitution under the UCL.  CIC, Applied, and other affiliates filed
6    a cross-motion for summary judgment that Pet Food had no claim
7    because it could show no actual loss.  The Court denied Pet Food's
8    motion, finding the EquityComp® program and its profit-sharing
9    component in particular were *not* void or illegal just because it
10   was not filed with CDI, and noting the Court's "disagreement with
11   the Commissioner" on that point.  The Court granted Applied's motion
12   and awarded judgment to Applied and its co-defendants.

13        119. *Stovall's Inn v. Applied Underwriters, Inc., et al.*, JAMS
14   arbitration No. 120005573, is another example where Defendants'
15   unreasonable demands would reward frivolous claims and force
16   Applied and its co-defendants to give up substantive rights.  In
17   that arbitration, the claimant has demanded that it be excused from
18   paying insurance premiums owed to CIC and has demanded over $9
19   million in purported damages because of alleged overpayment of $1.3
20   million in premium.  These types of claims have been soundly
21   rejected in other arbitrations.  Stovall's refusal to pay the
22   premiums under its CIC policies is also directly contrary to the
23   CDI's own decisions and precedent upholding the enforceability of
24   those workers' compensation policies.  But Defendants' proposal to
25   resolve the conservatorship would require Applied to settle
26   Stovall's matter and accept a less favorable result than Applied
27   otherwise could obtain if the matter were decided on its merits.
28   The same is true for numerous other cases in which other plaintiffs

1 or claimants allege damages based on theories the courts have
2 rightly rejected.   For example, in *Charter Oak Oil Co., Inc. v.*
3 *Applied Underwriters, Inc., et al.*, in the United States District
4 Court, District of Connecticut, the plaintiff is demanding that it
5 be excused from paying filed and approved insurance rates for CIC,
6 asking for essentially free insurance.

7     120. Two California Insurance Commissioners in at least nine
8 administrative matters, including Defendant Commissioner Lara, also
9 have written detailed opinions holding CIC policyholders are bound
10 to pay the CIC policies' premiums even if other parts of the
11 EquityComp® programs are voided.

12     121. Finally, Defendants also have not even made the barest
13 attempt to demonstrate compliance with state law or the
14 proportionality of the Plan's forced settlement conditions to the
15 actions that purportedly necessitated the Conservation Order.
16 Section 1037 of the California Insurance Code authorizes
17 conservators to settle actions "against that person upon such terms
18 and conditions as the commissioner shall deem to be most
19 advantageous to the estate of the person being administered" or
20 "otherwise dealt with" under the relevant provisions of law.
21 Moreover, the Commissioner does not even attempt to suggest that
22 these terms are "most advantageous" to the estate, claiming instead
23 that they are "fair and equitable."   Nor could the Commissioner
24 credibly make such an argument when, as discussed above, court
25 decisions have regularly rejected the Commissioner's and private
26 plaintiffs' position.   Further, nothing in this provision
27 authorizes forcing settlement of claims by non-parties.

28

122. This condition also has nothing to do with the alleged violation that gave rise to this proceeding.  It does nothing to "rehabilitate" CIC to force CIC, much less *Plaintiffs*, to settle litigation on disadvantageous terms.  The Commissioner asserts in paragraph 25 of the affidavit of Joseph Holloway (submitted with the Rehabilitation Plan) that the pending litigation "was one of the main issues that held up the Commissioner's approval of Mr. Menzies' Form A form."  If so, it only further confirms that the Commissioner's abuse of power extends back to the original delay.  The litigation should have had nothing to do with approving the CIC-CIC II merger, given that the Commissioner himself has admitted the merger presented no risks to policyholders, and that there was no dispute the new company would be adequately capitalized.  The Holloway affidavit thus confirms the Commissioner was using the merger as a lever to coerce CIC and Plaintiffs into adopting their desired litigation outcome.

**G.   Defendants' Actions Have Caused and Are Causing Irreparable Harm To Plaintiffs.**

123. The considerable harm to Plaintiffs' business and future prospects from Defendants' actions, including the Conservation Order, conservatorship, and Rehabilitation Plan, far outweigh any benefits thereof, particularly because the Commissioner has not (and cannot) place Plaintiffs in conservatorship but continues to inflict harm on them indirectly.

124. *First*, the Rehabilitation Plan conditions that Defendants seek to impose would force a transfer of assets from Plaintiffs to policyholders through forced resolution of currently contested disputes, including disputes in which Plaintiffs have already won

1    sums of money.  This injury would become irreparable if the Plan is
2    approved.

3       125. *Second*, Defendants' effort to strip CIC of its California
4    business would likewise inflict harm on Plaintiffs because of their
5    dependence on the contractual relationships with CIC involving
6    California customers.  Plaintiffs project a decrease of over $100
7    million in profits through 2024 due to the coerced loss of CIC's
8    California business.

9       126. *Third*, the conservatorship has caused stays of pending
10   private litigation, including one in which CIC was due a favorable
11   judgment of $340,419.  In addition, the Commissioner's appointed
12   conservator has used its purported powers under the conservatorship
13   to control Plaintiffs' business and prohibit certain transactions.
14   This includes a December 11, 2020 letter from the conservator
15   instructing CIC and Applied not to transfer CIC's existing policies
16   or to renew expired CIC policies with affiliate Continental
17   Indemnity Company, and not to communicate with insureds about doing
18   so.

19      127. *Fourth*, the ongoing conservatorship has damaged and will
20   continue to inflict irreparable damage on Plaintiffs' goodwill,
21   credit, and profits arising out of the multiple contractual
22   relationships they have with CIC.  A conservatorship naturally (if
23   erroneously here) undermines the confidence of market participants—
24   including brokers, existing insureds, and potential insureds—in the
25   financial soundness of those who are subject to it.  As a result,
26   brokers representing insureds and potential insureds of CIC have
27   called CIC seeking information about its status and expressing
28   concern about the conservatorship's impact, and whether there is a

1  financial concern about CIC and Plaintiffs.  Employees are confused
2  as to their role and the future at Applied and ARS.  Policyholders
3  have expressed concern and confusion about their Policies and
4  coverages with CIC.  Defendants have admitted in correspondence
5  that the Conservatorship already has created "adverse consequences
6  to CIC . . . ."  Plaintiffs estimate that the conservatorship has
7  cost them $10 million in lost profits to date.

8      128. Furthermore, CIC's affiliated insurers, which are also
9  not subject to the Commissioner's authority, are part of a
10 Reinsurance Pooling Agreement.  Any downgrade to CIC's AM Best "A"
11 rating due to conservatorship concerns would threaten a downgrade
12 for the entire pool, further damaging the ability of CIC's
13 affiliated insurers to operate and compete in the market.

14     129. Defendants have intensified the harm by breaking their
15 promise to state publicly that the conservatorship did not arise
16 from financial problems within CIC or Plaintiffs.  They likely did
17 so to maximize the coercive pressure of the conservatorship—but
18 whatever their reasons, the harm is even worse due to Defendants'
19 silence.

20     130. The same is true for the impact on goodwill of the
21 draconian rehabilitation conditions they are demanding.  Defendants
22 know the impact of those conditions.

23     131. As an example of irreparable harm to future prospects,
24 when CIC seeks to get a new Certificate of Authority or purchase
25 another insurance company, CIC (like any insurance company) must
26 complete a Uniform Certificate of Authority Application that
27 includes a Biographical Affidavit from all company directors and
28 officers.  The forms ask whether the company has been subject to

1    judicial, administrative, regulatory or disciplinary actions,

2    specifically including conservatorship, and requires a full

3    explanation of any such actions. Defendants are well aware that

4    this improper conservatorship is something CIC must now disclose in

5    connection with any expansion plans, which is damaging to those

6    prospects and therefore damaging to Plaintiffs' goodwill.

7        132. Plaintiffs are without an effective remedy to address

8    this irreparable harm. Plaintiffs are not parties to the state

9    conservation proceeding. Even those who are parties to it have

10   limited ability to influence its result given its heavily

11   deferential standard of review and the limited opportunity for

12   discovery.

13       133. These limited opportunities for a hearing and for

14   discovery have been clear throughout the case. Defendants submitted

15   the Application *ex parte*. Further, on September 15, 2020, the

16   California state court denied CIC's Motion to Vacate

17   Conservatorship without making any factual or legal findings. The

18   California state court also set a briefing schedule for approval of

19   a rehabilitation plan. Defendants told Applied that if Applied did

20   not "voluntarily" agree to their version of a rehabilitation plan

21   for CIC, then the Commissioner would seek a court order approving

22   an even more draconian and harmful version of the plan. This is

23   the epitome of bad faith and abuse of power. Defendants have now

24   followed through on their threat with the filing and publication of

25   the Rehabilitation Plan.

26       134. The Rehabilitation Plan threatens to force Applied and

27   ARS to incur settlement liability that it otherwise would choose

28   not to incur. Like imposition of the conservatorship, the threat

of liability in the Rehabilitation Plan immediately diminished the goodwill, borrowing power, and financial strength and planning capabilities of each Plaintiff.  These harms are not contingent on further action by the California state court.

### FIRST CAUSE OF ACTION
**Violation of Plaintiffs' Rights to Due Process Pursuant to the Fourteenth Amendment to the Constitution of the United States; 42 U.S.C. § 1983
(Against All Defendants)**

135. Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

136. Commissioner Lara is an elected official of the State of California who at all relevant times has purported to act under color of state law.  He has exercised and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

137. Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

138. To the extent any conduct alleged in this Complaint was undertaken by a subordinate of Defendants, such conduct was taken with their actual and/or constructive knowledge thereof.

139. Defendants, and their subordinates, have violated and continue to violate Plaintiffs' constitutional due process rights by, *inter alia*, obtaining a conservatorship over CIC without prior notice to Plaintiffs or opportunity for them to be heard. Defendants achieved this deprivation through knowingly false

1   pretenses, misrepresentations, and omissions of material fact.  The
2   conservatorship has deprived Plaintiffs of their liberty and
3   property interests as detailed in this complaint.  Defendants also
4   continue to deprive Plaintiffs of their property and liberty without
5   due process by maintaining the conservatorship in bad faith, and
6   failing to negotiate in good faith with Plaintiffs.

7       140. Defendants further seek to deprive Plaintiffs of their
8   right to due process by imposing as a condition of lifting the
9   conservatorship the loss of Plaintiffs' right to defend and
10  prosecute claims in ongoing private litigation.

11      141. Defendants have further violated the due process rights
12  of Plaintiffs by depriving them of property and liberty interests
13  even though Plaintiffs are not being conserved and do not stand in
14  a corporate familial relationship with CIC.   Nor does the
15  Commissioner have authority over Plaintiffs, which are not
16  California corporations and do not transact insurance within
17  California.

18      142. The existing and anticipated decrease in Plaintiffs'
19  profits is the result of Defendants' conduct with respect to
20  Menzies' Form A submissions, imposition of the conservatorship, and
21  imposition of the Rehabilitation Plan.  Defendants' conduct has
22  diminished and continues to diminish Plaintiffs' goodwill,
23  borrowing power, financial strength, and ability to make financial
24  plans.

25      143. As a direct and proximate result of Defendants' direct
26  interference in Plaintiffs' businesses, and related actions,
27  inactions, and failures, Plaintiffs have been and are still being
28  deprived of their constitutional right to due process of law.

<u>SECOND CAUSE OF ACTION</u>
**Violation of Plaintiffs' Rights to Equal Protection Pursuant to the Fourteenth Amendment to the Constitution of the United States; 42 U.S.C. § 1983**
**(Against All Defendants)**

144. Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

145. Commissioner Lara is an elected official of the State of California who at all relevant times has purported to act under color of state law. He has exercised and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

146. Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law. They have exercised and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

147. To the extent any conduct alleged in this complaint was undertaken by a subordinate of Defendants, such conduct was taken with their actual and/or constructive knowledge thereof.

148. Defendants, and their subordinates, have violated and continue to violate Plaintiffs' constitutional equal protection rights by exacting punitive measures against Plaintiffs with no rational basis for doing so. Defendants intentionally treated Plaintiffs differently than others similarly situated by, *inter alia*,

- refusing to approve or disapprove any of Menzies' Form A submissions after six months of CIC's good faith negotiation with CDI, when at all relevant times CDI knew

the approval must occur by a date certain or CIC would face a $50 million penalty;

- imposing the conservatorship without notice to CIC or Plaintiffs premised upon knowingly false pretenses, misrepresentations, and omissions of material fact, including omission of the fact that CIC was fully solvent;

- imposing the conservatorship in connection with the proposed CIC-CIC II merger when

    - CDI expressly stated to New Mexico regulators that the merger presented no risk to California policyholders;

    - CDI made no objection to New Mexico regulators concerning the proposed CIC-CIC II merger on October 9, 2019 during a formal Form A hearing CDI representatives attended; and

    - CDI gave no notice to CIC or Plaintiffs that CDI was contemplating imposition of a conservatorship until filing the *Ex Parte* Application; and

- publicly threatening Applied and ARS with implementation of a rehabilitation plan that will force each to settle currently contested litigation, when

    - neither Plaintiff is under conservation;

    - neither Plaintiff is subject to CDI's regulatory jurisdiction; and

    - CDI had already agreed at the end of the *Shasta Linen* administrative matter that resolution of EquityComp® disputes would occur through private litigation, not regulatory fiat.

149. Defendants' conduct has directly interfered with Plaintiffs' property interests in their contracts with CIC and their ability to maintain litigation efforts to vindicate their rights and seek compensation due and owing to Plaintiffs. Defendants continue to deprive Plaintiffs of their rights to due process by

1    maintaining the conservatorship in bad faith, failing to negotiate

2    in good faith with CIC and Plaintiffs, and now through the imminent

3    implementation of punitive terms set forth in the Rehabilitation

4    Plan.

5        150. Defendants, and their subordinates, have also violated

6    and continue to violate Plaintiffs' constitutional equal protection

7    rights by demanding Applied agree to conditions in the

8    Rehabilitation Plan even though Plaintiffs are not being conserved

9    and they do not stand in a corporate familial relationship with

10   CIC.  Nor does the Commissioner have authority over Plaintiffs,

11   which are not California corporations and do not transact insurance

12   within California.

13       151. Upon information and belief, the Commissioner has

14   intentionally treated Plaintiffs differently than similarly-

15   situated insurance companies, or their managers or underwriting

16   agents.  The intent of Insurance Code § 1011(c) is to prevent

17   companies from removing assets from California via merger in cases

18   of insolvency, not to force insurance companies, or their managers

19   or underwriting agents, to resolve separate litigation or other

20   matters collateral to the reasons the conservatorship was imposed.

21       152. Plaintiffs lack access to records or other sources of

22   information that would establish whether, in the 150-year history

23   of CDI, the Commissioner has (1) imposed a conservatorship on an

24   insurance company for violation of 1011(c) when CDI has admitted

25   the merger at issue presents no risk to California policyholders;

26   (2) imposed a conservatorship on an insurance company for violation

27   of 1011(c) when CDI has admitted the insurance company is fully

28   solvent; or (3) threatened implementation of a rehabilitation plan

1  including punitive measures against entities that are not being

2  conserved and which are not under CDI's jurisdiction. Such

3  information is peculiarly within the possession and control of

4  Defendants.

5      153. The pattern, practice, and nature of the Commissioner's

6  unduly punitive actions against CIC and Plaintiffs can have no

7  conceivable legitimate purpose because (1) there was never any basis

8  to believe that, by redomesticating to New Mexico via a merger with

9  CIC II, CIC would or could escape the regulatory authority of CDI

10  with respect to CIC's California policyholders; and (2) New Mexico's

11  approval of the CIC-CIC II merger was contingent on (i) CIC II

12  adopting all liabilities of CIC and (ii) CIC II maintaining $248

13  million in reserves in California to secure obligations to

14  California policyholders. CDI can and routinely does regulate the

15  actions of insurance companies that operate within California but

16  which are domiciled or headquartered in other jurisdictions by

17  virtue of a California Certificate of Authority or the insurer being

18  commercially domiciled in California—in fact, most insurers

19  operating in California are domiciled or headquartered elsewhere.

20      154. As a direct and proximate result of Defendants' actions,

21  inactions, and failures, Plaintiffs have been and are still being

22  deprived of their constitutional right to equal protection.

23  **THIRD CAUSE OF ACTION**

**California Insurance Code § 1011(c) Unlawfully Burdens Interstate**
24  **Commerce in Violation of Article 1, § 8, cl. 3 of the United**
**States Constitution**
25  **(Against All Defendants)**

26

27      155. Plaintiffs incorporate all preceding paragraphs into this

28  cause of action by reference as though fully restated herein.

156. Commissioner Lara is an elected official of the State of California who at all relevant times has purported to act under color of state law.  He has exercised and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

157. Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law.  They have exercised and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

158. Defendants, by virtue of their positions at the California Department of Insurance, are responsible for implementing the California Insurance Code.

159. California Insurance Code § 1011(c) provides as follows: "The superior court of the county in which the principal office of a person described in Section 1010 is located, upon the filing by the commissioner of the verified application showing any of the conditions in this subdivision exist [. . .] shall issue its order vesting title to all of the assets of that person, wheresoever situated, in the commissioner or his or her successor in office, in his or her official capacity, and direct the commissioner forthwith to take possession of all of its books, records, property, real and personal, and assets, and to conduct, as conservator, the business of the person, or so much thereof as to the commissioner may seem appropriate, and enjoining the person and its officers, directors, agents, servants, and employees from the transaction of its business or disposition of its property until any of the following further order of the court: [. . .] That the person, without first obtaining

1  the consent in writing of the commissioner, has transferred, or

2  attempted to transfer, substantially its entire property or

3  business or, without consent, has entered into any transaction the

4  effect of which is to merge, consolidate, or reinsure substantially

5  its entire property or business in or with the property or business

6  of any other person."

7      160. Section 1011(c) of the California Insurance Code, as

8  applied to the merger of CIC, a California entity, and CIC II, a

9  New Mexico entity, constitutes an unlawful burden on interstate

10 commerce in violation of the Commerce Clause of the United States

11 Constitution, Article I, Section 8, Clause 3, because it

12 discriminates against interstate mergers and restrains insurance

13 products from entering interstate commerce.

14      161. Section 1011(c) of the California Insurance Code, as

15 applied by Defendants in connection with the merger of CIC with CIC

16 II, does not advance a legitimate local purpose that cannot be

17 served by other nondiscriminatory measures. Out-of-state insurers,

18 including workers' compensation insurers, routinely provide

19 coverage to California residents and businesses while domiciled or

20 headquartered in other states. Moreover, the Commissioner could

21 provide an identical level of protection to California

22 policyholders by simply allowing CIC to merge with CIC II, and then

23 requiring CIC II to satisfy all of the CDI's standard requirements

24 for an out-of-state insurer with respect to all business in

25 California. The Commissioner has never alleged in any forum that

26 CIC or CIC II is incapable of fulfilling those standard

27 requirements.

28

162. The Commissioner has obtained a conservatorship over CIC under California Insurance Code Section 1011(c) and maintained the conservatorship in bad faith and in violation of law in an attempt to block the interstate merger of CIC and CIC II.

163. Defendants have demanded onerous concessions from Plaintiffs in exchange for the Commissioner's consent to the merger of CIC and CIC II under the California Insurance Code, including a demand that Plaintiffs relinquish economically valuable rights to defend pending litigation and waive any and all claims against the Commissioner, both of which would harm Plaintiffs' business.

164. Section 1011(c) of the California Insurance Code, as applied to the interstate merger of CIC and CIC II, is unconstitutional, and Plaintiffs seek a declaration of their rights with regard to this controversy.

**FOURTH CAUSE OF ACTION**
**Defendant's Actions Constitute a Taking in Violation of the Fifth and Fourteenth Amendments of the United States Constitution (Against All Defendants)**

165. Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

166. The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides: "nor shall private property be taken for public use, without just compensation."

167. Plaintiffs have a property interest in their contractual rights and causes of action that the Defendants seek to require Plaintiffs to settle as a provision of the Rehabilitation Plan.

168. At all times relevant hereto, Plaintiff Applied had a property interest in contractual rights with CIC under the MSA and

1  Plaintiff ARS had a property interest in contractual rights with
2  CIC under the UAA.

3       169. Commissioner Lara is an elected official of the State of
4  California who at all relevant times has purported to act under
5  color of state law.  He has exercised and continues to exercise his
6  supervisory authority, duties, and responsibilities over all
7  subordinates within California's Department of Insurance.

8       170. Schnoll and Henley are appointed officials of the State
9  of California who at all relevant times have purported to act under
10 color of state law.  They have exercised and continue to exercise
11 their supervisory authority, duties, and responsibilities over
12 subordinates within California's Department of Insurance.

13      171. To the extent any conduct alleged in this complaint was
14 undertaken by a subordinate of Defendants, such conduct was taken
15 with their actual and/or constructive knowledge thereof.

16      172. Defendants seek to take Plaintiffs' valuable property and
17 contractual rights and to transfer them to policyholders by
18 requiring the settlement of ongoing litigation involving Plaintiffs
19 and policyholders.   Further, Defendants are unconstitutionally
20 conditioning the lifting of the harm caused by the conservatorship
21 on the deprivation of Plaintiffs' valuable contract and property
22 rights even though there is no nexus of reasonable proportionality
23 between those two conditions.

24      173. Defendants, and their subordinates, also have effected an
25 unlawful taking of Plaintiffs' property interests in their
26 contractual rights with CIC by obtaining a conservatorship over CIC
27 in violation of law and by maintaining the conservatorship in bad
28 faith to the detriment of Plaintiffs' rights.  At all relevant times

1  CIC has been solvent.  The Commissioner has admitted CIC's only

2  alleged misconduct justifying imposition of the conservatorship—

3  merging with CIC II—presented no risks to California policyholders

4  or anyone else.  For an entire year of negotiations after imposition

5  of the conservatorship, CDI threatened that if CIC and Plaintiffs

6  did not accept a proposed "consensual" rehabilitation plan, CIC and

7  Plaintiffs should expect an "even worse" non-consensual plan.

8      174. The Commissioner's punitive measures against CIC and

9  Plaintiffs are designed to chill the exercise of Plaintiffs'

10  constitutional rights.  The conservatorship and Rehabilitation Plan

11  do not protect the public.  Those measures merely secure a political

12  benefit for the Commissioner and the other Defendants, and provide

13  an unearned financial benefit to private attorneys prosecuting

14  pending EquityComp® disputes with whom the Commissioner has aligned

15  himself and CDI.

16      175. Defendants have used and are using the Commissioner's

17  conservatorship and control over CIC in bad faith to coerce Applied

18  and ARS into agreeing to an impermissibly overbroad rehabilitation

19  plan.  The Rehabilitation Plan would require Plaintiffs to forego

20  economically valuable rights to defend pending and future

21  litigation, and deprive Plaintiffs of the entire value of their

22  contractual interests with CIC.  Those interests depend on CIC's

23  continuation of its sale and servicing of insurance policies in

24  California.

25      176. Defendants' actions have directly and adversely impacted

26  Plaintiffs.  Defendants' interference with CIC's goodwill in the

27  marketplace through the conservatorship has reduced CIC's policy

28  renewals and overall business, reducing the revenue flowing to

1 | Plaintiffs and interfering with Plaintiffs' reasonable investment-
2 | backed expectations of their contractual rights with CIC.

3 | 177. Plaintiffs were not afforded the opportunity to challenge
4 | imposition of the conservatorship by San Mateo County Superior.

5 | 178. There is no other adequate forum for Plaintiffs to
6 | challenge the constitutionality of the conservatorship or the
7 | Rehabilitation Plan.

8 | 179. Defendants have not paid just compensation to Plaintiffs
9 | for Defendants' actions. The forced distribution of contract and
10 | property rights from one private party to another may be enjoined
11 | regardless of the availability of just compensation.

12 | 180. In light of the United States Supreme Court decision *Knick*
13 | *v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019),
14 | Plaintiffs are entitled to bring constitutional claims under § 1983
15 | without first bringing a state lawsuit, even when state court
16 | actions addressing the underlying behavior may be available.

17 | 181. Without relief from Defendants' unlawful taking of
18 | Plaintiffs' property interest in their contractual rights with CIC,
19 | Plaintiffs will continue to suffer economic harm from Defendants'
20 | actions.

21 | 182. Plaintiffs are entitled to injunctive relief enjoining
22 | Defendants from continuing the Commissioner's bad-faith
23 | conservatorship.

**FIFTH CAUSE OF ACTION**
**First Amendment Retaliation; 42 U.S.C. § 1983**
**(Against All Defendants)**

27 | 183. Plaintiffs incorporate all preceding paragraphs into this
28 | cause of action by reference as though fully restated herein.

---

54          FIRST AMENDED COMPLAINT
CASE NO. 2:20-CV-02096-WBS-AC

1    184. The conduct of Defendants deprived Plaintiffs of their

2    First Amendment rights to criticize public officials in the press

3    and Plaintiffs' First Amendment right petition the government,

4    exercised through its access to the courts.

5    185. As described in more detail elsewhere in this complaint,

6    Defendants violated Plaintiffs' rights by retaliating against

7    Plaintiffs for (1) accessing the federal courts to dispute

8    Defendants' interpretation of the insurance code as it applied to

9    the RPA and raising valid defenses in good faith in lawsuits brought

10   by policyholders; and (2) criticizing Defendants' treatment of

11   Plaintiffs and the Commissioner's conduct with respect to Menzies'

12   Form A submissions and his imposition of a conservatorship over

13   CIC.

14   186. Defendants' actions (including without limitation

15   imposition of the conservatorship over CIC, threats prior to the

16   Rehabilitation Plan, and publication of the Rehabilitation Plan,

17   with the provisions regarding other pending litigation) are

18   sufficiently punitive and drastic that they would chill a person of

19   ordinary firmness from defending themselves in litigation or

20   publicly criticizing public officials.

21   187. Upon information and belief, each of the Defendants has

22   directed, approved, and overseen the Commissioner's retaliatory

23   conduct by, among other things, imposition of the conservatorship

24   over CIC and imposition of the Rehabilitation Plan against CIC and

25   Plaintiffs.

26   188. Defendants have not acted with probable cause for their

27   conduct. Upon information and belief, no CDI Commissioner or Deputy

28   Commissioner has directed, approved, or overseen imposition of a

1    conservatorship over an insurance company that CDI admits faces no

2    solvency risk.  Upon information and belief, no CDI Commissioner or

3    Deputy Commissioner has directed, approved, or overseen the

4    imposition of a rehabilitation plan requiring settlement of

5    litigation or arbitration disputes by entities not ordinarily

6    subject to CDI's regulatory jurisdiction.

7         189. Defendants' conduct, as set forth above, has been and is

8    the ongoing direct and proximate cause of severe and ongoing injury

9    to Plaintiffs' goodwill and profits.  But for Plaintiffs' exercise

10   of their First Amendment rights, Defendants would not have conserved

11   CIC, and Defendants would not have conserved any other insurer under

12   the same circumstances.

13        190. Given the ongoing nature of Defendants' conduct,

14   Plaintiffs seek injunctive relief.

15                          **PRAYER FOR RELIEF**

16        WHEREFORE, in connection with the preceding paragraphs,

17   Plaintiffs respectfully request that the Court enter judgment in

18   their favor and against Defendants, and award the following relief:

19        A.   An Order declaring the Commissioner's actions, as

20   alleged, violate Plaintiffs' rights to due process and equal

21   protection under the Fourteenth Amendment to the United States

22   Constitution;

23        B.   An Order declaring the Commissioner's actions, as

24   alleged, constitute a violation of the Dormant Commerce Clause and

25   an unlawful taking of Plaintiffs' property interests in violation

26   of the Fifth and Fourteenth Amendments to the United States

27   Constitution;

28

1    C.    An Order directing the Commissioner to take all necessary

2  steps to end CIC's conservatorship pursuant to California Insurance

3  Code § 1012, and enjoining the Commissioner from continuing the

4  conservation;

5    D.    An Order directing the Commissioner to withdraw the

6  Rehabilitation Plan;

7    E.    An Order enjoining the Commissioner from seeking to

8  impose the Rehabilitation Plan on Plaintiffs, and enjoining its

9  enforcement and any individual condition or constraint therein;

10    F.    An Order enjoining the Commissioner from seeking to

11  impose as a condition in the Rehabilitation Plan that Plaintiffs

12  settle lawsuits and relinquish their right to pursue claims;

13    G.    An Order enjoining the Commissioner from seeking to

14  impose as a condition in the Rehabilitation Plan that CIC divest

15  all of its assets;

16    H.    An Order enjoining Defendants from continuing to

17  retaliate against Plaintiffs for exercising their First Amendment

18  rights to speech and petition;

19    I.    An Order for reasonable attorneys' fees under 42 U.S.C.

20  § 1988(b); and

21    J.    Such other relief as the Court may deem just and

22  appropriate.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

---

57        FIRST AMENDED COMPLAINT
          CASE NO. 2:20-CV-02096-WBS-AC

1

<u>**DEMAND FOR JURY TRIAL**</u>

2

    Plaintiffs demand a jury trial on all issues so triable.

3

4

Dated: December 14, 2020   Respectfully submitted,

5

6

                By: */s/ Maxwell V. Pritt*

7

                   Maxwell V. Pritt (SBN 253155)
                   mpritt@bsfllp.com

8

                   Joshua I. Schiller (SBN 330653)
                   jischiller@bsfllp.com

9

                   Beko O. Reblitz-Richardson (SBN 238027)
                   brichardson@bsfllp.com

10

                   BOIES SCHILLER FLEXNER LLP
                   44 Montgomery Street, 41st Floor

11

                   San Francisco, CA 94104
                   Telephone: (415) 293-6800

12

                   Facsimile: (415) 293-6899

13

                   *Counsel for Plaintiffs Applied Underwriters, Inc.*

14

                   *and Applied Risk Services, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28