David J. Millstein (California SBN 87878)
Gerald S. Richelson (267705)
Owais Bari (SBN 321954)
MILLSTEIN & ASSOCIATES
100 The Embarcadero, Penthouse
San Francisco, CA 94105
Telephone: (415) 348-0348
Facsimile:  (415) 348-0336
dmillstein@millstein-law.com
grichelson@millstein-law.com
obari@millstein-law.com

**Attorneys for Plaintiff:**
RUSTY AREIAS, an Individual and
MERCURY PUBLIC AFFAIRS, LLC,
a Delaware corporation transacting
business in California, assignees of
California Strategies, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSTY AREIAS, an Individual and MERCURY PUBLIC AFFAIRS, LLC, a Delaware corporation transacting business in California, assignees of California Strategies, LLC<br><br>    Plaintiffs,<br><br>  vs.<br><br>APPLIED UNDERWRITERS, INC, an Omaha corporation transacting business in California, STEVEN MENZIES, an Individual, ALAN QUASHA, an Individual, and DOES 1-20 inclusive,<br><br>    Defendants. | Case No.: 4:21-CV-00023-JST<br><br>**SECOND *AMENDED* COMPLAINT FOR:**<br><br> 1) **BREACH OF WRITTEN CONTRACT**<br> 2) **BREACH OF ORAL CONTRACT**<br> 3) **BREACH OF ORAL CONTRACT (BONUS)**<br> 4) **UNJUST ENRICHMENT**<br> 5) **QUANTUM MERUIT** |

Plaintiffs Rusty Areias, an Individual, and Mercury Public Affairs, LLC, allege as follows:

## I.    INTRODUCTION

This case is a commercial dispute between public affairs consultants and an insurance company for services rendered.  Defendants hired consultants to assist with regulatory issues related to the purchase of a Company, whose merger had to be approved by either California's Insurance Commissioner or a Commissioner of another state, or the transaction would not occur, and the insurance company would forfeit a $50 million deposit.  The merger was approved by the state of New Mexico, the forfeiture was avoided, but the Defendants never paid.

## II.    PARTIES

1.    At all times material hereto, Mercury Public Affairs LLC ("Plaintiff Mercury") was or is a limited liability company incorporated under the laws of Delaware, with its principal place of business located at 770 L Street Suite 1440, Sacramento, CA 95814, and is the assignee for value from California Strategies, LLC of all rights and benefits under the Consulting Agreement between Applied Underwriters, Inc., and California Strategies LLC.

2.    At all times material hereto, Rusty Areias, ("Plaintiff Areias") an individual, is a resident of the State of California, is the assignee for value from California Strategies, LLC of all rights and benefits under the Consulting Agreement between Applied Underwriters, Inc., and California Strategies, LLC. Mr. Areias is a former member of the California State Assembly and partner in California Strategies, a political consulting firm.

3.    At all times herein, Plaintiff Mercury provided services in connection with the matter, was a sub-contractor of California Strategies who agreed to share all fees in the matter equally, and was assigned any and all interest of California Strategies jointly and severally with Rusty Areias.

4.    Fabian Nunez is the former Speaker of the California Assembly and a principal of Mercury who worked with Cal Strategies/Rusty Areias in this matter.

5.    At all times material hereto, Defendant Applied Underwriter, Inc. ("AU") was and is an Omaha corporation whose principal place of business is 950 Tower Ln 14th Floor,

Foster City, California, and had been authorized by California Department of Insurance to transact insurance in the State of California.  The company is headquartered in Omaha, Nebraska. AU's subsidiaries include California Insurance Co., Continental Indemnity Co., Pennsylvania Insurance Co., Illinois Insurance Co., and Texas Insurance Co., that are collectively known as North American Casualty Co.

6.    At all times material hereto, Defendant Alan Quasha ("Quasha") is an individual and resides in the State of New York. Plaintiff is informed and believes and alleges thereupon that Alan Quasha acquired non-insurance service company subsidiaries of Applied Underwriters, Inc.

7.    At all times material hereto, Defendant Steven M. Menzies ("Menzies") is an individual and resides in San Francisco, California. Defendant Steven Menzies is the sole owner and president of Applied Underwriters, Inc.

8.    Does 1-20, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to the Plaintiffs. When the true names and capacities are ascertained, the Plaintiff will amend by inserting their true names and capacities herein.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants participated in the acts complained of herein and is the agent of all other defendants in undertaking actionable conduct alleged herein.  Some of these DOES colluded with Defendants and acted as their agents in doing the acts alleged herein.

9.    Plaintiffs are informed, believe, and based thereon alleges, that at all times relevant hereto, each defendant herein was, and is, an agent and employee of each other defendant and, in performing the acts herein alleged, was acting within the course and scope of said agency and employment and that each defendant sued herein is jointly and severally liable to plaintiffs for the damages alleged herein.

10.    This Complaint's allegations on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

/ / /

/ / /

### III.   JURISDICTION AND VENUE

11.     This case was originally filed in San Francisco Superior Court as a court of general jurisdiction.   The complaint alleged Defendants appeared to reside in other states, except for Defendant Steve Menzies, who was a resident of California. Defendants removed the case to Federal District court predicated upon the allegation that Menzies was a resident of Nebraska.

### IV.   GENERAL ALLEGATIONS

12.     AU Holding owned all the issued and outstanding shares of Applied Underwriters, Inc. (AU), and all of the issued and outstanding shares of North American Casualty Co. ("NAC"). AU owned all the issued and outstanding shares of several non-insurance business service companies.

13.     Berkshire Hathaway agreed to sell its stock in AU Holding for $920 million to Menzies ("Berkshire Deal"). Through the Berkshire Deal, Menzies would acquire sole ownership of AU Holding, Inc., and all its insurance subsidiaries, including the Domestic Insurers, AU, and all its non-insurance business services subsidiaries.

14.     Plaintiffs further allege upon information and belief that Quasha was set to acquire AU's non-insurance business services subsidiaries contingent upon Menzies acquiring sole ownership of AU Holding and AU.

15.     One of the Berkshire deal's essential terms was that Menzies had to obtain regulatory approval of the merger.   Menzies had to secure approval of Form-A Application pending before California Department of Insurance ("CDI") or re-domesticate AU's wholly owned subsidiary California Insurance Company ("CIC") from California to another state prior to September 2019.

16.     If Menzies failed to secure regulatory approval for the re-domestication of CIC, in California or any other state, *he would lose the $50 million non-refundable deposit that he made to Berkshire Hathaway and the sale would not occur.*

17.     Needing assistance in the regulatory area, on or about in February and after that in late June 2019, Fabian Nunez met with defendants Menzies, Quasha, and AU's treasurer Jeffrey A. Silver ("Silver") multiple times in person while plaintiff Areias met with them

telephonically. The parties discussed at length the terms of engagement for assisting with completion of their purchase and obtaining approval of California Insurance Company's ("CIC") FORM-A application. In these meetings, plaintiffs inquired about AU and CIC's standing with the CDI and asked the defendants Menzies, Quasha, and Silver to disclose any issues that might pose a challenge to get CIC's FORM-A approved.  In response to this inquiry, Menzies, Quasha, and Silver jointly stated that they expected the FORM-A's approval but that it was being held up with red tape.

18.     On or about June 26, 2019, plaintiffs and defendants had agreed upon the material terms of their engagement.  Plaintiffs agreed to provide general and strategic consulting services to assist in getting the approval of California Insurance Company's ("CIC") Form-A application or assist in CIC's re-domestication to the State of Illinois or any other state subject to the 'parties' agreement.  Defendants agreed to pay $1 million and costs as fees for 'plaintiffs' services""."  The payment provision stated as follows:

> "*The Client agrees to provide to the Consultant a success fee of $1,000,000. for assisting with obtaining approval of California Insurance Company's ("CIC") Form A application with the California Department of Insurance at IDB 19-798; APP-2019-00689 or approval of CIC's re-domestication from California to the State of Illinois, either of which must occur on or before September 30, 2019 unless Client and Consultant mutually agree in writing to a later date or to re-domestication to a state other than Illinois*".

19.     Plaintiffs immediately started working on the project with mutual assent and understanding of the parties. Plaintiffs at all times were representing the Defendants as their agents before CDI. Plaintiffs representation of the Defendants before CDI was subject to the control of the Defendants. The agreement was signed about a week later.

20.     Under the Consulting Agreement, the parties could, and did, mutually agree to re-domesticate CIC to a state other than Illinois (New Mexico) under the agreement. The Consulting Agreement is ambiguous as to whether the agreement required a writing only to agree to a new date or whether a writing was required to agree to re-domestication to a state other than Illinois as well.

21.     Commencing in July and thereafter, a plethora of negative information came to light against AU in the media.  The press reported that Defendant Menzies and AU's 'executives' multiple meetings with California Insurance Commissioner Ricardo Lara in 2019 and that Lara had exercised his authority to overturn unfavorable decisions against AU. In August and then September 2019 a Consumer Watchdog, a nonprofit organization investigated and found that individuals who made contributions to Ricardo Lara's behalf were connected to Defendant Menzies and were controlled by Applied Underwriters for the purposes of influencing decisions pertaining to CIC's merger and lawsuits pending before CDI.  They reported that the timing of the contributions as well as the fact that all the contributors were from out of state by individuals who had not made any previous political contributions in state of California was suspicious and linked the timing of the contributions to the various favorable decisions that Commissioner Lara gave to AU in lawsuits already decided by ALJs.  Additionally, allegations that AU had a history of illegal sales and claims practices became the subject of public attention. This caused California Insurance Commissioner Ricardo Lara to return AU's improper contributions and recuse himself from the case.

22.     As time went on, the public scrutiny associated with the burgeoning scandal surrounding AU and its subsidiaries greatly diminished the prospects of obtaining CIC's Form-A approval from CDI, or that AU could get re-domestication to another state without objection from CDI.  Although AU and Quasha and Menzies insisted these claims were overblown, they realized that the FORM A may not be approved, and certainly not before looming deadline at which time would lose their deposit.

23.     By late August, it became obvious that the CDI was not going to approve CIC's FORM-A application in time.  AU, Menzies, and Quasha decided that under the circumstances, CIC would attempt to re-domesticate to *any* state that it could to avoid the forfeiture of their $50,000,000 deposit to Berkshire and communicated that to Plaintiffs.  Defendants began to look for other states to re-domesticate to and fixed on New Mexico.

24.     Because CIC was domesticated in California, Defendants and CIC were aware that if California objected the re-domestication, New Mexico would not allow it to occur.

Defendants AU, Menzies, and Quasha requested Plaintiffs  direct all of their efforts to obtain an agreement from CDI to not object to CIC's re-domestication to another state, i.e., New Mexico.

25.     Defendants had another motivation. Defendants apparently believed that if CDI did *not* object to the re-domestication to New Mexico, they would be able to argue that this was tantamount to approval of the FORM-A.  They believed that if California failed to object in New Mexico it amounted to an endorsement of the solvency and past conduct of the parties, such that they could then make "another run" at California.  They did not share this plan with the Plaintiffs, but their actions suggest that this was their plan all along. (Defendants subsequently filed a lawsuit against the State of California alleging that 'CIC's failure to object to New 'Mexico's re-domestication was a de facto approval its FORM-A.) Defendants asked plaintiff to direct their efforts solely to preventing California regulators from objecting to the re-domestication.

26.     Defendant AU agreed to Plaintiff's request to modify the contract. 'Plaintiff's services were engaged to assist in approval of re-domestication to "another" state, and New Mexico was decided upon, and to try and prevent an objection from CDI. It was understood that and that payment for services rendered would be made after New Mexico approved re-domestication.

27.     As the deadline approached for forfeiture, on or about September 2019, Menzies obtained a 10-day extension from Berkshire Hathaway, from September 30, 2019, to October 10, 2019, so that it could pursue domestication in New Mexico.  Quasha informed Plaintiffs that that Menzies and/or Quasha paid an additional $10 million to Berkshire Hathaway over the $50 million for the extension.  Based on this, and to ensure that Plaintiffs continued to work on the New Mexico re-domestication with great efforts, Defendants agreed to a one-month extension, timed to occur after the hearing before New Mexico Office of Superintendent had occurred.

28.     On or about in October 2019, Defendant Quasha, growing more distressed that he would lose the $60 million dollar deposit, offered the Plaintiffs as an additional incentive, he would pay an additional fee of $1 million if Plaintiffs could avoid the forfeiture, which would be paid on the date the merger was finalized.  He was set to lose a sizeable fortune and the chance to acquire AU's non-insurance service companies. Quasha was, therefore, willing to incentivize

the plaintiffs to expedite and intensify their efforts.  Plaintiffs had not asked for additional compensation but accepted this re-affirmation of commitment and offer to amend the agreement to increase their compensation if they intensified their efforts.

29.     Between August and October 9, 2019 Plaintiffs continued to consult with and provided services to Defendants, directed at securing CDI's non-objection to the New Mexico domestication so as to avoid the forfeiture.

30.     Plaintiffs devised a comprehensive strategy to assist in CIC's re-domestication to New Mexico and ensure that CDI would not object to the re-domestication in New Mexico, meeting with CID staff for that purpose.  Plaintiffs were not aware Quasha had no intention of paying the extra $1 million to the plaintiffs as it undertook these intensified efforts.

31.     On or about October 1, 2019, the parties agreed to extend the Consulting Agreement by one month. They agreed that all other terms of their previously agreed upon arrangement inclusive of subsequent oral contracts and modifications remain the same.  A true and correct copy of that extension is attached hereto as **Exhibit 2.**  The parties signed the extension with the intention to extend the orally modified Consulting Agreement.

32.     On October 9, 2019, at a hearing before New Mexico Office of Superintendent. three senior officials representing CDI at the hearing were asked if they object to the Berkshire Merger Deal. Objection would have prevented re-domestication.  As a direct result of the plaintiffs efforts, none of the officials from CDI objected during the conference, rather, "*CDI attorneys told the Superintendent that because of 'CIC's considerable capital, surplus, and deposit, the proposed merger presented no risks to California policyholders*"" (See 'AU's Complaint in case 2:20-cv-02096-WBS-AC., ¶ 60). "*The hearing officer recommended the approval of 'CIC's Form A, and Superintendent Franchini issued an Order specifically noting CDI participated in the hearing and did not object. A copy of the Order was sent to the Commissioner by e-mail the same day, and again the Commissioner did not object*"" (See 'AU's Complaint in case 2:20-cv-02096-WBS-AC., ¶ 61) Re-domestication was achieved and Quasha and/or defendants avoided a forfeiture of $60 million, (as well as obtained the "de facto" approval of FORM -A, at least under their interpretation).

33.     On or about October 15, 2019, plaintiffs sent an invoice via email to Quasha for payment of $2 million in consulting fees for assisting in securing re-domestication to the state of New Mexico and securing 'California's non-objection.   Quasha, in response to 'Plaintiffs' email, affirmed that AU owed the initial contract price, disputed the second $1 million, and asked the bill be re-stated, with a suggestion of future work:

> *"Rusty,*
>
> *There is a saying on Wall Street that the bears do well, and the bulls do well, but the pigs get slaughtered…. Please send the correct bill without the "supplement". We would like to work together in the future, but not if trust gets damaged.*"

34.     Shortly after the re-domestication and accomplishment of the merger, 'AU's history of misdeeds caught up with them.   On November 5, 2019, the Superior Court of San Mateo appointed the California Insurance Commissioner as Conservator for California Insurance Company.

35.     The Consulting Agreement was signed between California Strategies, LLC, and AU.   On or about November 5, 2020, California Strategies, LLC, assigned the benefits and claims of the agreements to Plaintiffs Rusty Areias and Mercury Public Affairs, LLC.

## FIRST CAUSE OF ACTION

### (Breach of Written Contract and Mutual Mistake Against AU)

36.     Plaintiffs incorporate by reference each of the General Allegations set forth above in paragraphs 9-35 as though fully set forth herein.

37.     On July 10, 2019, California Strategies, LLC contracted with Defendant AU to provide general and strategic consulting services under the Consulting Agreement's terms dated July 10, 2019, attached hereto as **Exhibit 1 and states:**

/ / /

/ / /

/ / /

/ / /

"*The Client agrees to provide to the Consultant a success fee of $1,000,000. for assisting with obtaining approval of California Insurance Company's ("CIC") Form A application with the California Department of Insurance at IDB 19-798; APP-2019-00689 or approval of CIC's re-domestication from California to the State of Illinois, either of which must occur on or before September 30, 2019 unless Client and Consultant mutually agree in writing to a later date or to re-domestication to a state other than Illinois*."

38.     The parties agreed in writing in on October 3, 2019 to extend its timeline for performance from September 20, 2019 to October 30, 2019 (See attached **Exhibit 2**) and mutually understood that all efforts would be directed to re-domestication in a state other than California or Illinois, and California's non-objection was the focus of all of Plaintiffs efforts.

39.     Defendants and Plaintiffs contemplated at the time of the original Contract that Plaintiffs would be paid upon approval of domestication but neglected when extending the agreement to specify New Mexico as another state for domestication.

40.     On or about August 2019 Defendants and Plaintiffs mutually intended to achieve approval of CIC's re-domestication to New Mexico. At all times after October 3, 2019, through the mutual mistake of the parties or unilateral mistake of plaintiffs which defendants reasonably suspected, the extension did not accurately reflect the intention of the parties that Plaintiffs efforts were to be exclusively directed to achieving approval of re-domestication in New Mexico.

41.     Thereafter, after the successful approval for re-domestication in New Mexico, on October 15, 2019, plaintiffs sent an invoice to Quasha for $2 million.  Defendant Alan Quasha accused Plaintiffs of being greedy by asking for an extra $1 million but did not dispute that AU owed Plaintiffs under the contract. He wrote:

"*Rusty,
There is a saying on Wall Street that the bears do well, and the bulls do well, but the pigs get slaughtered.... Please send the correct bill without the "supplement". We would like to work together in the future, but not if trust gets damaged.*"

42.     Quasha's affirmation of the contract evidences the parties' mutual mistake in not including approval of re-domestication in the written contract amendment.

43.     On or about October 9, 2019, AU through and as a direct result of the assistance of Plaintiffs, including working with California regulators to prevent an objection to New Mexico domestication, received approval from the state of New Mexico to re-domesticate there and saved $60 million as well the Berkshire Deal.

44.     On or about October 15, 2020, defendants, in writing through their agent, Quasha admitted 'plaintiffs' performance of the contract and ratified their obligation to pay $1 million for services rendered, asking them to send a "correct" bill (for $1 million., see para 41, above).

45.     In breach of the modified Consulting Agreement, defendants failed to pay Plaintiffs the $1 million fees for services rendered pursuant to the Consulting Agreement.

46.     Defendants have no justification or defense for their breach of the terms of the modified Consulting Agreement.

47.     As a direct and proximate result of Defendants' breaches, plaintiffs have suffered direct financial loss.

48.     Wherefore, plaintiffs request the relief set forth below.

## SECOND CAUSE OF ACTION

### (Breach of Oral Contract Against ALL DEFENDANTS)

49.     Plaintiffs incorporate by reference each of the allegations set forth above in paragraphs 9-44 as though fully set forth herein.

50.     Plaintiff alternatively alleges that on or about August 2019, Plaintiffs and Defendants Menzies, AU, and Quasha entered into an oral contract to provide strategic consulting services to assist their efforts to cause CDI not to object to CIC's re-domestication to any other state for a $1 million fee.  The fee would be paid on the date CIC's re-domestication to New Mexico was approved without CDI objection.

51.     The Agreement was ratified and affirmed by Alan Quasha, as set forth in paragraph 32 above.

52.     The plaintiffs did all, or substantially all, of the significant things that the oral contract required them to do.

53.     Defendants in breach of the oral agreement failed to pay 'plaintiffs' $1 million fee for services rendered pursuant to the oral agreement despite CIC's re-domestication to New Mexico on October 9, 2019.

54.     Defendants have no justification or defense for this breach of the oral contract. As a direct and proximate result of 'defendants' breach, plaintiffs have suffered extreme financial loss.

55.     Wherefore, plaintiffs request the relief set forth below.

## <u>THIRD CAUSE OF ACTION</u>

### (BREACH OF ORAL CONTRACT AGAINST ALAN QUASHA)

56.     Plaintiffs incorporate by reference each of the allegations set forth above in paragraphs 9-55 as though fully set forth herein.

57.     As the date for forfeiture grew close, Alan Quasha became concerned he would lose $60 million he had put up for the deposit.  As Quasha explained it, the forfeiture was unavoidable if re-domestication did not occur before October 10, 2019.  He said that he had put up a $50 million initial deposit and then another $10 million to get an extension of the Berkshire Deal.

58.     Quasha became well aware that negative developments made it unlikely for Plaintiff to perform and earn their fee.  Plaintiffs had not been paid anything for their efforts and Quasha wanted them to remain incentivized and committed to work on its behalf.

59.     In October 2019 as a result of the above, Quasha orally and spontaneously stated to Mr. Areias and Mr. Nunez during a teleconference that he would double the $1 million consulting fees if they could continue to work and intensify their efforts so that AU would avoiding forfeiture of the $60 million.  He represented that payment of $2 million would be contingent upon avoiding forfeiture of $60 million in the Berkshire Hathaway deal.

60.     Quasha's promise was made specifically to induce Plaintiffs to continue to work to prevent California from objecting to re-domestication in New Mexico and intensifying their commitment and efforts and devote any amount of time necessary to accomplish the goal.

61.     Plaintiffs accepted 'Quasha's generous offer and said they would do everything they could to get CDI not to object so that the re-domestication would be approved and continued to work on the matter and intensify their efforts into accomplishing these goals.

62.     After the successful approval for re-domestication in New Mexico, on October 15, 2019, plaintiffs sent an invoice to Quasha for $2 million.  Defendant Alan Quasha accused Plaintiffs of being greedy by asking for an extra $1 million but did not dispute that AU owed Plaintiffs under the contract. He wrote:

> "*Rusty,*
> *There is a saying on Wall Street that the bears do well, and the bulls do well, but the pigs get slaughtered…. Please send the correct bill without the "supplement". We would like to work together in the future, but not if trust gets damaged.*"

63.     The plaintiffs did all, or substantially all, of the significant things that the oral contract required them to do.

64.     Defendant Quasha in breach of the oral agreement failed to pay plaintiffs' the additional $1 million fee for services rendered pursuant to the oral agreement despite the approval CIC's re-domestication to New Mexico on October 9, 2019 without objection by CDI.

65.     Defendants have no justification or defense for this breach of the oral contract. As a direct and proximate result of defendants' breach, plaintiffs have suffered extreme financial loss.

66.     Wherefore, plaintiffs request the relief set forth below.

### FOURTH CAUSE OF ACTION

### (UNJUST ENRICHMENT AGAINST ALL DEFENDANTS)

67.     Plaintiffs incorporate by reference each of the allegations set forth above in paragraphs 9-66 as though fully set forth herein.

68.     To the extent that the services rendered by the Plaintiffs and the benefits received by the Defendants is beyond the scope of the Consulting Agreement and not governed by the Consulting Agreement, Plaintiffs plead this cause of action.

69.     Plaintiffs conferred financial benefits upon defendants independent of the Consulting Agreement. As a direct and proximate result of Plaintiffs' assistance and services,

Menzies completed the $920 million acquisition of AU, avoided a forfeiture of $60 million, AU achieved the approval of re-domestication of CIC to New Mexico, and Quasha acquired non-insurance service subsidiaries of AU.

70.    As a direct and proximate result of fraud and other wrongful acts, defendants unjustly withheld $2 million from the plaintiffs, which is due and payable since October 9, 2019, when CIC re-domesticated to New Mexico.

71.    It would be inequitable and unjust for the defendants to be permitted to retain any of the unlawful proceeds resulting from their fraudulent, opportunistic, illegal, and inequitable conduct.

72.    As alleged in this Complaint, defendants have been unjustly enriched because of their wrongful conduct and fraud at the plaintiffs' expense. Defendants unjustly retained $2 million owed to the plaintiffs in fees for services rendered and as a direct and consequential result of the 'plaintiffs' services acquired a benefit of $60 million by avoiding forfeiture on the Berkshire Deal.   Accordingly, plaintiffs are entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the defendants as a result of fraudulent, inequitable, and wrongful acts.

73.    Wherefore, plaintiffs request the relief set forth below.

**FIFTH CAUSE OF ACTION**

**(COMMON COUNT AGAINST ALL DEFENDANTS)**

74.    Plaintiffs incorporate by reference each of the allegations set forth above in paragraphs 9-73 as though fully set forth herein.

75.    If the Court finds that there was no valid contract, plaintiffs allege a claim for common counts; that defendants AU, Menzies, and Quasha owe plaintiffs money for performing consulting services from July 2019 to October 2019, including but not limited to reviewing materials, coordinating meetings and devising a successful strategy for re-domestication of the CIC from California to New Mexico which saved the defendants $60 million in potential forfeitures and allowed them to continue transacting insurance business unhindered from CID.

76.     Plaintiffs performed these services in good faith and expected the reasonable value of their services rendered.

77.     Plaintiffs performed the services as requested by the defendants without fault and with diligence.

78.     Defendants accepted the 'plaintiffs' services and have failed to plaintiffs for the consulting services rendered from July to October 2019 as stated in paragraph 60 above.

79.     Wherefore, plaintiffs request the relief set forth below.

## V.     **PRAYER**

WHEREFORE, Plaintiffs pray for:

1.     Wherefore Plaintiffs pray for reformation of the Consulting Agreement to reflect the parties' true intention at the time of the execution of its extension.

2.     $1 million in breach of written contract as set forth above.

3.     $1 million for breach of the Oral Promise of a Bonus

4.     Actual, statutory damages, punitive or treble damages, and such other relief available under law.

5.     The reasonable value of 'Plaintiffs' services that the defendants received.

6.     Equitable relief in the form of restitutionary and/or non-restitutionary disgorgement of a portion of the $60 million dollars saved as a result of 'Plaintiffs' efforts and or value of the new Company.

7.     Pre-judgment and post-judgment interest.

8.     The costs of bringing this suit, including reasonable 'attorneys' fees if provided by contract

9.     All other relief allowed by law in which the Court deems proper.

/ / /
/ / /
/ / /
/ / /
/ / /

Dated: November 9, 2021                    **MILLSTEIN & ASSOCIATES**


By : ___*/s/ David J. Millstein*_____
David J. Millstein, Esq.
Gerald S. Richelson, Esq.
Owais M. Bari, Esq.

Attorneys for Plaintiffs
RUSTY AREIAS, an Individual and
MERCURY PUBLIC AFFAIRS, LLC,
a Delaware corporation transacting
business in California, assignees of
California Strategies, LLC

## CERTIFICATE OF SERVICE

I, Chrystal Pham, am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Millstein & Associates, 100 The Embarcadero, Penthouse, San Francisco, CA 94105.  On the date set forth below, I served the document(s) entitled:

**SECOND AMENDED COMPLAINT FOR: BREACH OF WRITTEN CONTRACT, BREACH OF ORAL CONTRACT, BREACH OF ORAL CONTRACT (BONUS), UNJUST ENRICHMENT QUANTUM MERUIT**

on the following attorney(s) of record and/or parties in said cause as follows:

| **Attorneys for Defendants:** | |
|---|---|
| BOIES SCHILLER FLEXNER LLP<br>Maxwell V. Pritt (SBN 253155)<br>mpritt@bsfllp.com<br>44 Montgomery Street, 41st Floor<br>San Francisco, CA 94104<br>Tel: (415) 293-6800<br>Fax: (415) 293-6899 | |

**[X]**  **VIA ELECTRONIC MAIL**: By personally sending such documents via electronic email to each recipient at the email address listed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed at San Francisco, California on **November 9, 2021.**


_____ */s/ Chrystal Pham*_____

Chrystal Pham